**EMBASSY MOVING & STORAGE CO., Inc.**

v.

**The UNITED STATES.**

No. 2–69.

United States Court of Claims.
April 17, 1970.

Alan F. Wohlstetter, Washington, D. C., attorney of record, for plaintiff. Stanley I. Goldman, Washington, D. C., of counsel.

Steven L. Cohen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION TO DISMISS OR REMAND

COWEN, Chief Judge.

Plaintiff Embassy Moving & Storage Co. entered into Contract No. DA44–109–MDW–2977 with the Army Joint Household Goods Shipping Office for the transportation of unaccompanied baggage between points in Washington, D. C., and defined portions of Maryland and Virginia. The contract authorized the performance of various transportation services, described in Items 17, 18 and 19,[1] in two "Zones",[2] and covered the

---

1. Items 17, 18, and 19, in pertinent part, provide:

"17. *Complete Service (Unaccompanied Baggage)*. Service includes pickup, inventorying, weighing, strapping, marking and packing (when required) of unaccompanied baggage containers not exceeding 15 cubic feet. Unaccompanied baggage normally consists of footlockers, trunks, and similar containers and may include owner-furnished, securely-locked canvas duffle bags or B–4 type bags when articles therein are not susceptible to breakage. Baggage may consist also of cribs, baby carriages, collapsible play pens and similar articles; it shall not include articles of furniture. Containers shall be constructed of a light-weight material which will give adequate protection to insure safe delivery. Service provided un-

der this item shall include, when necessary, drayage from owner's residence to Contractor's facility and common carrier's terminal, military installation shipping office or interim storage.

\*   \*   \*   \*   \*

"18. *Unaccompanied Baggage Packed by Owner*. Service under this item shall provide pickup, weighing, strapping, banding and marking unaccompanied baggage described in Item 17 which has been packed by owner. Service provided under this item shall include, when necessary, drayage from owner's residence to Contractor's facility, common carrier's terminal and military installation shipping office or interim storage.

\*   \*   \*   \*   \*

period from April 13, 1966, through December 31, 1966.

At issue here are 673 shipments from Zones I and II to Dulles Airport and from Zone II to Washington National Airport. Both airports were beyond the contractually authorized performance zones. Plaintiff's petition seeks damages for the breach by the defendant of an alleged informal contract, or amendment to Contract No. DA44–109–MDW–2977, for transportation outside of Zones I and II.

The defendant moves to dismiss the petition on the grounds that shipment to the airports was required by Contract No. DA44–109–MDW–2977, or was made pursuant to constructive change orders, and that complete relief was available under the contract and plaintiff failed to exhaust the administrative remedies provided for therein. Alternatively, the defendant moves the court to suspend proceedings herein and remand for the exhaustion of administrative remedies.

The following facts are necessary for the disposition of these motions: There is no dispute as to the fact that the contracting officer directed plaintiff to deliver the 673 shipments to the airports, that the airports were outside of Zones I and II, or that the transportation was furnished. By letters under date of July 28 and August 2, 1966, the contracting officer advised plaintiff that Items 17 and 18 of the contract required delivery to the " 'common carrier's terminal' (*i. e.,* Dulles International)" and that such service should be "invoiced as usual." Replying by letter of August 15, 1966,

plaintiff inquired as to the rates which should be charged for shipment beyond Zones I and II, and asked whether it would be acceptable to use "the primary contractor's rates as awarded." (Plaintiff's contract was a secondary contract supplementing a primary contract entered into by the Joint Household Goods Shipping Office and Aetna Van Lines. Plaintiff was not a subcontractor of Aetna Van Lines.)

There followed a series of telephone conversations between the contracting officer and plaintiff, the result of which, according to plaintiff, was the agreement by the contracting officer that the rates set forth below in a letter from the contracting officer to plaintiff, dated August 24, 1966, should be charged. Plaintiff maintains that in the course of such telephone conversations, the contracting officer became aware for the first time that plaintiff's contract, unlike that of Aetna Van Lines, did not contain Items 20 and 28, which authorized drayage outside of Zones I and II. The contracts were otherwise substantially identical. The letter of August 24, 1966, in pertinent part, read:

Thank you for bringing the drayage deficiency in your contract award to our attention. You may bill at the recorded rates of the prime contractor for mileage beyond the zones as follows: (Note: Rates quoted below are recorded rates of award including changes.)

Schedule I

| | |
|---|---|
| Zone I | $ .50 |
| Zone II | .50 |

"19. *Storage.* Service provided under this item shall include storage-in-transit of containerized articles subsequent to the interim period specified in items 1, 2, 5, 6, 7, 8, 11 and 12 after completion of containerization service at owner's residence or Contractor's facility when specifically ordered by the Contracting Officer. Service performed under this item shall not commence earlier than the 11th calendar day (for outbound shipment) from date of completion of containerization service. Date of release from storage shall not be considered in computation of storage charges."

2. The contract provides:

"CONTRACT ZONES (ASPR *4–303.5 (Oct. 1965)*: Services shall be performed within limits of the zones defined as follows:

"ZONE I—All of that area within: Arlington County, Va., Charles County, Md., City of Alexandria, Va., City of Falls Church, Va., Fairfax County, Va., Prince William County, Va.

"ZONE II—All of that area within: District of Columbia, Montgomery County, Md., Prince Georges County, Md."

Schedule II

Zone I _____ $ .025
Zone II _____ .05

In addition to their dispute as to whether the contracting officer was aware that plaintiff's contract did not contain Items 20 and 28 at the time the shipments to the airports were ordered, the parties disagree as to the rates agreed upon for shipment outside of Zones I and II. Plaintiff maintains that the letter of August 24 was written by the contracting officer to confirm their prior oral agreement and that the rates set forth therein are in accord with the terms of the agreement. The defendant contends that the agreed-upon rates were those provided in Item 20 of the Aetna Van Lines contract ($.10 per cwt. per mile from Zone I and $.15 per cwt. per mile from Zone II). According to the defendant, the higher rates stated in the letter of August 24 were the result of a "clerical error." These factual issues, however, must be resolved, along with other issues, in a trial or other proceedings by the trial commissioner on remand.

By letter under date of November 14, 1966, the contracting officer ordered plaintiff to discontinue shipping outside of Zones I and II. In pertinent part, the contracting officer stated:

It has come to my attention that you have been performing services under Items 20 and 28 in connection with Contract DA44–109–MDW–2977.

You are advised that Contract DA 44–109–MDW–2977 does not include award to you of these items. Your award under the contract consisted only of Items 17, 18 and 19, Zones I and II. You must therefore immediately discontinue performing under any items other than those for which you were awarded the contract.

Any billing for services already performed but not covered by the contract should be submitted to this office for handling under Public Law 85–804 and should not cite the contract number since it cannot be paid for thereunder.

Thereafter, on December 9, 1966, plaintiff submitted to the contracting officer a request to formalize the alleged informal contract under Public Law 85–804.[3] Plaintiff asked for payment in the amount of $14,814.21. By a Memorandum of Decision under date of March 3, 1967, the Commanding General of the Military District of Washington approved and authorized the formalization of the informal agreement for the sum of $3,408.25. To the extent here pertinent, the Commanding General found that plaintiff was entitled to compensation of $.10 per cwt. per mile from Zone I and $.15 per cwt. per mile from Zone II. By letter of March 24, 1967, plaintiff "rejected" the decision of the Commanding General. The rejection was treated as a request for reconsideration, which request was denied.

On January 2, 1969, plaintiff filed suit in this court, alleging breach by the defendant of the informal contract and the unlawful withholding of $14,814.21, the amount due at the rates claimed by plaintiff to be applicable.

I

The defendant first argues that plaintiff was required under Items 17 and 18

3. To the extent pertinent to this case, the Army regulations promulgated pursuant to Public Law 85–804 provide (ASPR 17–204.4, 32 C.F.R. § 17.204–4):

"Informal commitments.

"Informal commitments may be formalized under certain circumstances to permit payment to persons who have taken action without a formal contract; for example, where any person, pursuant to written or oral instructions from an officer or official of a Military Department and relying in good faith upon the apparent authority of the officer or official to issue such instructions, has arranged to furnish or has furnished property or services to a Military Department or to a defense contractor or subcontractor without formal contractual coverage for such property or services. Formalization of commitments under such circumstances normally will facilitate the national defense by assuring such persons that they will be treated fairly and paid expeditiously."

of the contract to make the shipments to the airports, since the items covered drayage to the "common carrier's terminal." The defendant concedes that the contract did not set forth the rates to be charged for such transportation, but maintains that relief was available to plaintiff under the contract in the form of an equitable adjustment.

■■ We reject this contention. It is true that Items 17 and 18 required drayage to the "common carrier's terminal," and there is no question but that the delivery points at the airports were such terminals. However, the items must be read in conjunction with the geographical limitations on plaintiff's authorized performance. The contract specifically provided that transportation shall be furnished "within the limits of" Zones I and II. As earlier noted, both Dulles and Washington National airports were outside of the zones. If the contract were to be read as the defendant proposes, these geographical limitations would thus be of no effect. It is well settled that the provisions of a contract must be read as a whole and that a contract should not be construed so as to render some or any of its provisions a nullity. *See, e. g.,* Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct. Cl. 384, 395 (1965).

Our conclusion that shipment outside of Zones I and II was not required by and was wholly without the contract is also based on the contemporaneous construction of the contract by both plaintiff and the contracting officer. There is nothing in evidence suggesting that the plaintiff ever regarded shipment be-

yond the zones as within the contract requirements. Plaintiff's inquiry as to the rates to be charged for such transportation and initiation of negotiations to effect an amendment to the contract or reach a new agreement suggest the contrary. Similarly, it is clear from the contracting officer's letter directing plaintiff to discontinue making shipments outside of Zones I and II, that the contracting officer was of the view that such shipments were neither required nor authorized by the contract. *See* Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 635–636, 119 Ct. Cl. 120, 187–188 (1951).

Finally, we believe it significant that plaintiff's contract did not contain Items 20 and 28, which were inserted in the substantially identical contract entered into by the defendant and Aetna Van Lines to authorize shipment beyond the defined performance zones.

## II

Alternatively, the defendant maintains that even if shipment outside of Zones I and II was not required, relief was available to plaintiff under the Changes article of the contract. According to the defendant, the contracting officer's letters to plaintiff under date of July 28 and August 2, 1966, may be considered to have been change orders under the constructive change doctrine.

■■ The standard Changes[4] clause (such as that in the instant contract) permits the Government to order changes within the general scope of the contract. Under the constructive change theory, the clause may be invoked when

---

4. The Changes article provides:

"The Contracting Officer may, at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract if within its general scope. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change unless the Contracting Officer grants a further period of time before the date of final payment under the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions; but nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise provided in this contract, no charge for any extra work or material will be allowed."

the contracting officer has ordered the contractor to render some service not required by but within the general scope of the contract, but has neglected to issue a formal change order. Len Co. & Associates v. United States, 385 F.2d 438, 443, 181 Ct.Cl. 29, 38 (1967). In any event, however, whether the change be formal or constructive, when the ordered "changes" amount to a drastic modification beyond the scope of the contract, this court has held that the Changes article is not applicable. *See, e. g.,* Air-A–Plane Corp. v. United States, 408 F.2d 1030, 1033, 187 Ct.Cl. 269, 275 (1969). Such a fundamental alteration is a breach of contract, entitling the contractor to damages.

Normally, a change in the place of delivery specified in the contract is the type of change which gives rise to a claim under the Changes article. In the instant contract, however, the place of delivery was not, as is usually the case, an incidental matter. For here the subject of the contract was "delivery." The parties contracted for transportation "within the limits" of Zones I and II. In the light of this geographical limitation, the "change" in the contract to include delivery to points outside of Zones I and II materially altered the nature of plaintiff's performance. Shipment beyond the zones was not "essentially the same work as the parties bargained for when the contract was awarded." Aragona Constr. Co. v. United States, 165 Ct.Cl. 382, 391 (1964). This construction is consistent with the parties' practical interpretation of the contract. As pointed out above, both the contracting officer and the plaintiff agreed that the transportation in dispute was wholly beyond the scope of the contract.

We hold, therefore, that under the standards set down by the court in the decisions cited above, the alleged "changes" ordered were not of the type intended to fall within the ambit of the Changes article. Plaintiff exhausted all of the administrative remedies that were available to it.

The parties agree, and correctly so, that Public Law 85–804 affords an *ex gratia* remedy which does not preclude later judicial relief. *See generally* Jansen, Public Law 85–804 and Extraordinary Contractual Relief, 55 Geo.L.J. 959 (1967).

The case is remanded to the trial commissioner for the resolution of the issues indicated in the opinion and for the determination of the amount of compensation to which the plaintiff is entitled. The defendant's motion is denied.