V. Jerome **WIEMAN** t/a Merchant Service

v.

The **UNITED STATES.**

No. 109–80C.

United States Court of Claims.

May 5, 1982.

Colleen Boothby, Washington, D. C., for plaintiff; Marc F. Efron, Washington, D. C., attorney of record. Crowell & Moring, Washington, D. C., of counsel.

Randall B. Weill, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, DAVIS, Judge, and SKELTON, Senior Judge.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM: *

The plaintiff seeks to recover a total of approximately $3,600,000, representing damages which he allegedly sustained in connection with two "requirements" contracts that the Government Printing Office (GPO) awarded to the plaintiff on July 1, 1975. The plaintiff received the contracts pursuant to a competitive bidding procedure in which the plaintiff was the low bidder.

Under one contract, No. 373, the plaintiff was to provide hauling services for a 15-month period (July 1, 1975—September 30, 1976) between the GPO warehouse in Franconia, Virginia, and various government agencies located in the Washington, D. C., Commercial Zone, as defined by the Interstate Commerce Commission. Contract 373 was later amended by a change order to include also hauling service between the Franconia warehouse and the Senate Office Building in Washington, D. C.

Under the other contract, No. 374, the plaintiff was to provide hauling service for the same 15-month period between the GPO warehouse in Franconia and the GPO headquarters in Washington, D. C.

The two contracts contained an identical "default" provision; and they both contained the usual "changes" and "disputes" provisions that are customarily included in government contracts. They did not contain the usual "termination for convenience" clause.

Both the plaintiff and the GPO apparently were dissatisfied with their contractual relationship.

---

* This opinion is based on that of Senior Trial Judge White, with modifications by the court. The necessary facts are stated in this opinion.

On review by the court of Trial Judge White's opinion, plaintiff (now represented by attorneys) does not take issue with any aspect of the trial judge's opinion, including those parts adverse to points originally made by plaintiff, appearing *pro se.* It is defendant which objects to the trial judge's failure to preclude further litigation.

The plaintiff discontinued the performance of hauling services for the GPO at the beginning of April 1976. On April 4, 1976, the plaintiff dispatched a teletypewriter message (TWX) to the GPO, stating that he was "unable to continue contract numbers 373 and 374 dated July 1975 having finally been run off the job a victim of your management improprieties and the conspiracy and sabotage perpetrated by the inhabitants of the GPO operation at Franconia Virginia."

The message referred to in the preceding paragraph was received by the GPO on April 5, 1976. That same day, the GPO dispatched to the plaintiff, at the address used in all previous communications, a telegram stating that the plaintiff's failure to make deliveries was considered to be "a condition that is endangering the performance of the contract[s]," and that "unless such condition is cured within 24 hours after receipt hereof the Government may terminate such contracts for default * * *." This telegram was not delivered to the plaintiff, however, as the plaintiff had left the address to which the telegram was sent, there was no one present at such address to accept delivery of the telegram, and Western Union was unable to obtain a new address or telephone number for the plaintiff.

The plaintiff having failed to resume deliveries, the GPO sent to the plaintiff on April 6, 1976, a notice stating that he was being held in default under the "default" provision of the contracts.

## I. Ownership of Claims

A question was raised in an earlier stage of the case concerning the ownership of the claims asserted by the plaintiff, in view of the 1978 bankruptcy proceedings before the United States District Court for the District of Maryland in which the plaintiff was involved.

At a conference which the trial judge held on June 19, 1981, with the plaintiff, acting *pro se*, and the attorney of record for the defendant, counsel for the defendant stated that, upon the basis of an examination of the record in the pertinent bankruptcy proceedings, he had concluded that the plaintiff is the owner of the claims asserted in the petition. Accordingly, counsel for the defendant withdrew any question or contention previously raised concerning the ownership of the claims, and conceded that the plaintiff has the right to prosecute them.

## II. Administrative Proceedings

By means of a letter dated April 30, 1976, and addressed to Public Printer, the plaintiff submitted "a claim for damages in the amount of $88,336.76 incurred while serving under your contract numbers 373 and 374 dated July 1975." Along with the letter, the plaintiff submitted a considerable volume of supporting material, which indicated that the total claim of $88,336.76 included a number of separate items that varied in amount from $292.28 to $34,322.68.

In accordance with subsequent correspondence between the GPO and the plaintiff, the plaintiff's letter of April 30, 1976, was treated as if it were a claim submitted to the contracting officer in accordance with the terms of the respective contracts.

In a decision rendered on November 9, 1976, the contracting officer denied all aspects of the plaintiff's claim.

The plaintiff thereupon took a timely appeal to the Contract Appeals Board of the GPO (the Board) under the "disputes" provision of the respective contracts.

After holding a hearing in January 1979, the Board denied the plaintiff's appeal in a decision dated February 11, 1980.

The plaintiff thereafter filed his petition with the court on September 19, 1980. The parties then filed the pending crossmotions for summary judgment which are disposed of in this opinion.

## III. Alleged Breaches of Contract

According to the petition, the plaintiff seeks to recover $3,500,000—or the major portion of the overall amount claimed in the petition—because the defendant allegedly breached contracts 373 and 374.

■ The allegations in the petition on this point are general and refer to "harass-

ment of Plaintiff * * * by Government Printing Office Personnel, with the design and intent of forcing Plaintiff to abandon his contracts." The result (according to the petition) was that "Plaintiff was forced, against his will, to abandon said Contracts, rather than suffer additional damages," and was "forced out of business and into the ignominious state of personal bankruptcy."

It is clear that the Board did not, and could not,[1] decide plaintiff's breach claims. Defendant contends, however, that the Board's decisions on the disputes within its jurisdiction—most especially the decision upholding plaintiff's termination for default—must operate under the principle of collateral estoppel to bar further litigation in this court of all or most of the breach claims. For the greatest part we reject that argument because the Board's determination was so narrowly based that it cannot be considered to have decided the facts underlying most of the breach claims plaintiff asserts in this court.

The reason for our conclusion is that, as we read the Board's opinion, all it decided with respect to default is that plaintiff defaulted because, though he was physically able to continue to perform, he refused to do so, and defendant did not actually prevent him physically from performing. As we understand its determination, the Board did not believe a contractor was excused from further performance by improper Government actions short of actual prevention of performance—for instance, we think the Board acted on the postulate that performance would not be excused even if the Government's improper actions increased costs extraordinarily, so long as plaintiff could still physically perform.

We make this reading of the Board's opinion—which is not entirely clear—primarily on the basis of two aspects of that opinion. First, the Board says flatly: "regardless of *any* dispute that might arise under the contract between the contractor and the Government, these contracts entitle the Government, as a matter of procurement policy *to an almost unqualified right to obtain timely performance*" (emphasis added). Second, the Board recognizes an exception only "if it is clear that Government *prevented* the contractor from doing what it agreed to do", adding that "In the instant case there was no credible evidence presented that indicated that continued performance was *actually prevented* by Government interference" (emphasis added). The combination of these statements adds up, to us, to the narrowest possible understanding (which may well be too narrow) by the Board of a contractor's duty to continue performance, i.e. that he was excused only if he was physically prevented from doing so. Accordingly, the Board's finding cannot be considered to have determined that plaintiff did not have justifiable excuse, under a broader and perhaps correct standard, for stopping performance.[2] Because plaintiff does not seem to assert, in his breach claims, that he was physically prevented from continuing to perform, we do not consider the Board's determination of that issue to collaterally estop plaintiff's breach claims.

The subsequent discussion relates mainly to the claim items totalling $88,336.76 which the plaintiff submitted in the administrative proceedings, and the Board's decision on such items.

## IV. *Alleged Intimidation of Witness*

■ Among the numerous attacks initially made by the plaintiff on the validity of the Board's decision is one relating to the alleged "harassment and intimidation of the Plaintiff's key witness by a Supervisor on the payroll of the Government Printing Office."

This allegation apparently relates to an incident involving Robert Beach, chief of a branch in the Stores Division of the GPO, who was called as a witness for the plaintiff

---

1. This claim arose well before the effective date of the Contract Disputes Act of 1978 and is not governed by that statute.

2. In other words the Board did *not* decide that plaintiff was not improperly interfered with (by the Government) in ways short of actual physical prevention of performance.

at the hearing before the Board. Sometime during the week that preceded the hearing, Lawrence Hall, Assistant Chief of the Stores Division, remarked to Mr. Beach, "I hear that you are now a hostile witness against the Government Printing Office." Mr. Beach replied that he was not a hostile witness against the GPO, but that he had made statements about the case several years previously, and he stood by those statements.

When asked on the witness stand about the incident, Mr. Beach testified before the Board that he did not like, and was very upset over, Mr. Hall's remark to him about being a hostile witness against the GPO.

There is nothing in the administrative record, however, to indicate that Mr. Beach was intimidated by Mr. Hall's remark or attitude, or that Mr. Beach's testimony at the hearing was affected in any way by the incident. On the contrary, Mr. Beach seemed to testify readily and fully concerning the matters about which he was asked and of which he had knowledge.

Consequently, irrespective of the obvious impropriety of Mr. Hall's remark, this incident apparently did not result in any prejudice to the plaintiff and, therefore, does not provide an adequate basis for overturning the decision of the Board.

### V. Tort Claim

One of the claims submitted by the plaintiff in the administrative proceedings was for $4,400 and was based upon physical damage allegedly done to highway trailers used by the plaintiff in the performance of the contracts. The plaintiff contended that such damage resulted from the careless or malicious acts of GPO personnel while loading the trailers at the Franconia warehouse.

■ This aspect of the claim which the plaintiff submitted in the administrative proceedings, insofar as it is based on the alleged tortious conduct of GPO personnel, was outside the jurisdiction of the Board under the "disputes" provision of the respective contracts. The jurisdiction of a board of contract appeals under the standard "disputes" clause in government contracts is limited to claims for equitable adjustments, for time extensions, and for other remedies under specific contract provisions authorizing such relief. *See United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 405, 86 S.Ct. 1545, 1551, 16 L.Ed.2d 642 (1966).

Accordingly, insofar as this claim was a tort claim it was not necessary for the Board to consider (as it did) whether the evidence established that actions by GPO personnel caused damage to the plaintiff's equipment. The Board reached a negative conclusion on this factual issue, but, in view of the jurisdictional defect, there is no occasion for the court to review the propriety of such determination. If plaintiff can show, however, that this claim is not tortious but is a proper part of his breach claim,[3] then the Trial Division will have to decide what weight, if any, to give to the Board's determination on this precise issue, including whether that determination is entitled to acceptance under the principle of collateral estoppel.

■ It should also be stated, in this connection, that the plaintiff's tort claim cannot be considered by this court *de novo,* as the court has no jurisdiction over tort claims. *Transcountry Packing Co. v. United States,* 215 Ct.Cl. 390, 399, 568 F.2d 1333, 1338 (1978). Section 1491 of title 28, U.S.C., expressly excludes "cases sounding in tort" from this court's general jurisdiction under the Tucker Act.

### VI. Funds Withheld

Another claim submitted by the plaintiff in the administrative proceedings was in the amount of $10,944.30, and it was for services actually performed under the contracts (according to the plaintiff) and not paid for by the GPO.

It appears from the administrative record that some funds otherwise due the plaintiff for services performed under the contracts

---

**3.** *I.e.,* if plaintiff can show that acts by GPO personnel damaged his equipment and thereby delayed or interfered with his performance of the contracts.

were withheld by the GPO because: (1) the Internal Revenue Service on April 20, 1976, filed a notice of levy in the amount of $10,160.44 against the plaintiff; (2) the IRS on June 22, 1976, filed a second notice of levy against the plaintiff, this one being in the amount of $15,226.21; and (3) the Department of Labor filed a notice requesting that the sum of $3,681.19, out of any moneys owed the plaintiff, be paid to the Wage and Hour Division of the Department for disbursement to the plaintiff's unpaid employees.

At the hearing before the Board, the plaintiff did not present any evidence tending to prove the invalidity of the notices filed by the IRS and the Department of Labor, or to prove that it was improper for the GPO, in accordance with such notices, to withhold funds otherwise due the plaintiff for services performed under the contracts.

▇ In the absence of evidence to the contrary, it must be held—in view of the presumption of validity which supports the legality of official administrative actions (*Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1301–1302 (1976)), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978)—that the notices from the IRS and the Department of Labor were proper, and that the GPO acted properly in withholding funds otherwise due the plaintiff, upon receiving the notices from the other agencies.

Consequently, the Board did not err in denying this aspect of the plaintiff's claim.

### VII. *Extra-Contractual Services*

A majority of the claim items involved in the administrative proceedings were for additional compensation in connection with what the plaintiff referred to as extra-contractual services demanded by the GPO under contract 374 and performed by the plaintiff.

Section 1 of the schedule in contract 374 contained three numbered items that described the services that were to be performed by the plaintiff under that contract.

Item 1 covered "Hauling Roll Stock Paper, Flat paper, blank envelopes and knocked-down cartons from Franconia, Virginia, to the GPO, Washington, D. C. and occasional backhaul," for which the plaintiff was to be paid at the rate of 12.3 cents per cwt.

Item 2 covered "Hauling elec. trucks, same as above, one-way haul either direction."

Item 3 covered "Occasional hauling of unweighed paper materials between the GPO and * * * Franconia, Va.," for which the plaintiff was to receive $34.50 per truckload.

(a) *M Street warehouse.* The plaintiff claimed $3,186.93 as additional compensation in connection with the performance of "hauling services involving the 'M' Street warehouse."

The written document which the plaintiff submitted to the contracting officer on this claim item asserted that there were 24 such hauls, that the plaintiff was required to render "Same day pick up and delivery" service on these hauls, that the plaintiff was paid $1,013.07 for hauling the 24 loads (presumably at the contract rate of 12.3 cents per cwt.), that he should have been paid $175 per load, or a total of $4,200, for the "expedited service," and that the GPO still owed him $3,186.93 ($4,200 minus $1,013.07) on the 24 loads involving the M Street warehouse.

Contract 374, as previously indicated, did not mention that the plaintiff was required to perform hauling service to or from any warehouse located on M Street. The "changes" provision of the contract, however, provided in part that "The Contracting Officer may, at any time, by a written order * * * make changes within the general scope of the contract in any one or more of the following: * * * (c) the place of origin, [or] (d) the place of delivery * * * "; and that "If any such change causes an increase * * * in the cost of * * * performance of any part of the work or services under this contract, * * * an equitable adjustment shall be made in the contract price * * *."

■ A requirement for the performance of hauling service by the plaintiff between the M Street warehouse and the GPO headquarters, or between the M Street warehouse and the Franconia warehouse, would seem to have been "within the general scope" of contract 374; and, therefore, it would have been appropriate for the contracting officer to issue a change order amending contract 374 so as to provide for such hauling service (just as the contracting officer, by means of a change order, amended contract 373 so as to include the performance of hauling service between the Franconia warehouse and the Senate Office Building within the language of that contract). The contracting officer, however, did not issue any written order including service to or from the M Street warehouse within the written language of contract 374.

The evidence in the record shows that, in the administration of contract 374, responsible GPO officials made it plain to the plaintiff that Roger King, the GPO official directly in charge of the Franconia warehouse, was authorized to give the plaintiff instructions as to what hauling services the plaintiff was to perform, and that the plaintiff was expected to comply with Mr. King's directives. The evidence also shows that it was Roger King who normally gave the plaintiff instructions (usually in the afternoon of the preceding day) as to what hauling services the plaintiff was to perform on a particular day. Consequently, although the evidence on this point in the record is not as clear as would be desirable, the only reasonable inference to be drawn from the evidence is that Roger King, in the administration of contract 374, directed the plaintiff to haul commodities to or from the M Street warehouse.

Even though Mr. King was not·expressly authorized to issue change orders, the evidence shows that the GPO acquiesced in, and accepted the benefits flowing from, Mr. King's orders. In view of this, Mr. King's directives that the plaintiff perform hauling services to or from the M Street warehouse must, in all fairness, be regarded as constituting a constructive change order, entitling the plaintiff to the benefits of the "changes" provision of contract 374, upon proper proof. *Cf. Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 525–26, 455 F.2d 1037, 1050–51 (1972).

Unfortunately for the plaintiff, the administrative record does not contain the sort of proof that would be necessary to support the plaintiff's claim for additional compensation in connection with the performance of hauling service to or from the M Street warehouse.

[7] There is no evidence in the record tending to show that the performance of such service caused any increase in the plaintiff's costs, over what his costs would have been in connection with the performance of the same sort of hauling service between the Franconia warehouse and the GPO headquarters (the places specifically mentioned in contract 374), or that the price of 12.3 cents per cwt. prescribed in the contract was unreasonably low in connection with the hauling service to or from the M Street warehouse, or that the charge of $175 per load which the plaintiff sought would have constituted a reasonable charge for such hauling service, or that the plaintiff was actually required to provide "expedited service" in connection with pickups from or deliveries to the M Street warehouse.

(b) *Farrington warehouse.* The preceding discussion with respect to the M Street warehouse is also applicable to the claim item which the plaintiff submitted on April 30, 1976, for additional compensation of $717.59 in connection with the performance of "hauling services involving the 'Farrington' warehouse."

(c) *Miscellaneous commodities.* The plaintiff claimed additional compensation of $5,574.98 for hauling 38 loads of commodities which were not expressly named among the commodities described in contract 374 as being within the terms of that contract. The plaintiff's statement on this claim item referred to these commodities under such designations as "Solid Load of Documents," "Solid Load of Pallets," "Load of Docu-

ments & Pallets," "Solid Load of Document Stock," etc. The plaintiff's statement asserted that he was paid $1,075.02 for hauling the 38 loads (presumably at the contract rate of 12.3 cents per cwt.), and that he should have been paid $175 per load for "same day pick up and delivery" service, or a total of $6,650 for the 38 loads, thus leaving $5,574.98 still due the plaintiff.

Much of what has been said previously in connection with the M Street warehouse claim applies also to the claim now under consideration. The "changes" provision in contract 374 authorized the contracting officer, by written order, to make changes within the general scope of the contract as to (among other things) "(b) work or services, * * * [or] (e) tonnage to be shipped." As the commodities involved in the claim now under consideration were similar in nature to those expressly named in contract 374, a formal change order by the contracting officer amending contract 374 so as to include the commodities involved in the 38 loads within the description of commodities set out in the contract would have been appropriate. However, no such formal change order was issued.

Again, it must be inferred from the evidence that Roger King, the GPO official who customarily instructed the plaintiff as to what commodities were to be hauled every day, directed the plaintiff to haul the various commodities that were involved in the 38 loads on which this claim was based. As the GPO acquiesced in, and accepted the benefits flowing from, such directives, Mr. King's directives must be regarded as constituting a constructive change order entitling the plaintiff to the benefits of the "changes" provision of contract 374, upon proper proof.

However, this claim item must also be rejected for the same sort of failure of proof that required the rejection of the plaintiff's M Street warehouse claim. The administrative record does not contain the type of evidence that would entitle the plaintiff to recover on this claim. There is no evidence showing that the plaintiff's costs in hauling the commodities involved in the 38 loads were greater than what his costs would have been in hauling, under similar circumstances, commodities expressly named in contract 374, or that the contract rate of 12.3 cents per cwt. was unreasonably low for hauling the commodities involved in the 38 loads, or that the charge of $175 per load which the plaintiff requested would have been a reasonable charge for this service, or that "same day pick up and delivery" service was required with respect to these commodities or (if required) caused him any unusual difficulty or extra costs.

■ (d) *Occasional hauling.* Item 3 of section 1 of the schedule in contract 374 called for "Occasional hauling of unweighed paper materials between the GPO and * * Franconia, Va." at $34.50 per truckload.

Among the claim items submitted by the plaintiff on April 30, 1976, was one that arose (according to the plaintiff's statement of the claim) in connection with the hauling of 43 loads of unweighed paper materials from the GPO headquarters to the Franconia warehouse. It appears from the plaintiff's statement of this claim item that the plaintiff was paid at the contract rate of $34.50 per truckload for hauling each of the 43 loads of unweighed paper materials. The plaintiff contended, however, that only seven of the 43 loads could properly be regarded as coming within the category of "occasional hauling" and, therefore, that 36 of the 43 loads constituted extra-contractual services which the plaintiff was required to render and for which he was entitled to additional compensation, over and above the contract rate of $34.50 per load. This particular claim was in the amount of $5,058 (36 truckloads at $175 per load for "expedited service," or a total of $6,300, minus the $1,242 actually received for hauling the 36 loads at $34.50 per load).

The word "occasional" in item 3 was undoubtedly used in the sense of "Occurring at irregular intervals; infrequent." WEBSTER'S NEW INTERNATIONAL DICTIONARY (2nd edition, unabridged (1955)).

The plaintiff's performance under contract 374 continued over a period of 9 months; and the 43 loads of unweighed

paper materials therefore averaged slightly less than 5 loads per month. Hence, the various demands that the plaintiff haul unweighed paper materials were clearly infrequent, inasmuch as contract 374 required that the plaintiff be prepared to haul up to maximum of 450,000 lbs. of materials each day, Monday through Friday, and also on Saturday, unless otherwise notified (see the discussion in (e), *infra*).

The information outlined by the plaintiff in support of this claim item indicated that the time intervals between consecutive loads of unweighed paper materials varied all the way from 1 day to 13 days. Accordingly, these loads were not only infrequent, but they occurred at irregular intervals as well.

It must be concluded, therefore, that according to the information set out by the plaintiff in his statement of this claim item, none of the 43 loads of unweighed paper materials represented service outside the language of item 3 of section 1 of the schedule in contract 374.

(e) *Saturday hauling.* The plaintiff's claim, as submitted on April 30, 1976, included an item of $292.28 in connection with hauling a load of paper stock on Saturday, January 10, 1976. The statement on this item indicated that the load consisted of 46,926 lbs., for which the plaintiff was paid at the contract rate of 12.3 cents per cwt., or $57.72. The statement said that the plaintiff was not notified on the preceding day (Friday) that this service would be required on Saturday and, therefore, that such hauling constituted extra-contractual service, for which the plaintiff should have been paid $175 for "same day pick up and delivery" and an additional $175 for working on Saturday, or a total of $350. Thus, according to the statement of the claim item, the sum of $292.28 was still due the plaintiff.

■ It appears to have been the plaintiff's position that he was not required by contract 374 to provide hauling service on Saturday unless he was notified earlier in the week that such service would be required. The pertinent provision of the con-

tract specifications (section 2 of the schedule) was paragraph (c), which provided as follows:

(c) The carrier will be required to furnish the whole services, specified herein, Monday through Friday during the contract period, unless otherwise notified. If hauling on Saturday is *not* required for a particular week, the carrier will be notified [emphasis supplied].

Although the syntax of paragraph (c) was somewhat less than perfect, the meaning of the provision was that the plaintiff would be required to provide hauling service each day, Monday through Saturday, unless otherwise notified. Accordingly, it was not outside the language of the contract for the plaintiff to be required to provide hauling service on Saturday, January 10, 1976.

Even if a different interpretation of paragraph (c) of the contract specifications were proper, the plaintiff's claim for hauling the load on Saturday, January 10, 1976, would nevertheless have to be rejected. At the hearing before the Board, the plaintiff did not present any evidence on which it could be determined that the charge of $350 which the plaintiff sought for this service—or any other figure higher than the contract rate of 12.3 cents per cwt. on which the payment to the plaintiff was based—would have constituted a reasonable charge for such service.

■ (f) *Propane-powered trucks.* The remaining item in the claim for additional compensation based on extra-contractual services related to the hauling of propane-powered trucks.

Item 2 of section 1 in the contract 374 schedule called for "Hauling elec. trucks, same as above [referring to item 1, which covered the hauling of paper stock, etc., between the Franconia warehouse and the GPO headquarters, at 12.3 cents per cwt.], one-way haul either direction."

Paragraph (b) of the contract specifications provided in part as follows:

(b) Carrier will not be required to haul in excess of 450,000 pounds of paper stock

in any one day. In addition, the carrier will be required to haul approximately 160 electric trucks during the contract period in either direction. * * * The price of hauling electric trucks is conclusively presumed to be included in the price of Item 1. Consequently, payment will be made only for paper stock hauled and no payment will be made for hauling electric trucks in either direction.

The plaintiff's statement of this claim item indicates that over a period of 16 weeks in the early fall of 1975, he was required to haul 32 propane-powered trucks from the Franconia warehouse to the repair shop at GPO headquarters, and then to haul them back to Franconia after they were repaired. The statement of the claim item estimated that the tonnage involved in hauling these trucks to the repair shop and then back to Franconia amounted to a total of 768,000 pounds, and the statement asserted that the plaintiff should have been paid 50 cents per cwt. for this hauling service, or a total of $3,840.

What has been said previously about constructive change orders, and about the necessity of proving damages, is also applicable to this claim item. The directives which required that the plaintiff provide hauling service for propane-powered trucks that were in need of repairs would seem to have been within the general scope of item 2 relating to the hauling of electric-powered trucks and, thus, to constitute a constructive change order.

The plaintiff, however, did not present before the Board any evidence tending to prove that the costs involved in hauling the propane-powered trucks were greater than his costs would have been in hauling electric-powered trucks under similar circumstances, or that the rate of 50 cents per cwt. which he sought would have been a reasonable rate for this hauling service.

(g) *Summary.* The plaintiff has failed to establish his entitlement to an equitable adjustment upward in the contract price because of the performance of extra-contractual services.

## VIII. *Hauling Hours*

The largest claim which the plaintiff submitted in the administrative proceedings was for $34,322.68 and was based upon what the plaintiff's statement of the claim referred to as the "time utilization factor."

Paragraph (i) of the contract specifications provided as follows:

(i) Hauling will normally be conducted during operating hours (8 a. m. to 4:30 p. m.), however, this will not necessarily preclude the requirement for an occasional haul between the hours of 4:30 p. m. and 12 p. m. (Midnight).

The plaintiff's statement of this claim indicated that instead of being allowed to conduct hauling operations each day for 8½ hours (*i.e.*, from 8 a. m. to 4:30 p. m.), the GPO's methods of operations were such that the plaintiff could actually work only from 8:15 a. m. to 11:10 a. m., and from 11:50 a. m. to 3:30 p. m., or only for 6 hours and 35 minutes of "production time." The statement of the claim then set out a rather elaborate mathematical computation purporting to show that this resulted in a loss to the plaintiff of $34,322.68 because of the "time utilization factor."

The plaintiff did not present at the hearing before the Board evidence sufficient to prove this claim. However, as this claim related to the alleged failure of the GPO to afford the plaintiff the amount of daily working time specified in the contracts, it was in the nature of a breach-of-contract claim. Accordingly, it will be reserved for the reception of proof in the subsequent judicial proceedings to be held on the alleged breach-of-contract issue.

## IX. *Plaintiff's Salary*

The overall amount which the plaintiff claimed in the administrative proceedings included an item of $19,999.99, which allegedly represented the plaintiff's loss of salary for the 26 weeks remaining on contracts 373 and 374 after they were terminated.

The plaintiff's statement of this claim indicated that the figure of $19,999.99 was

computed on the basis of a weekly salary of $769.23, multiplied by 26 weeks.

In the first place, as indicated in the preceding parts of this opinion, the plaintiff failed to establish in the administrative proceedings his right to recover on the basis of the various allegations concerning administrative actions that were within the jurisdiction of the Board under the "disputes" provision of contracts 373 and 374. Consequently, it necessarily follows that the plaintiff was not entitled to recover in the administrative proceedings for any post-contract loss of salary.

However, inasmuch as the plaintiff's breach-of-contract claim is being reserved for further judicial proceedings, the plaintiff should be permitted to establish (if he can) the alleged loss of post-contract salary as a proper item of damages in connection with the alleged breach of contract.

### X. *Conclusion*

For the reasons and to the extent stated in the preceding parts of this opinion, the plaintiff's motion for summary judgment is denied and the defendant's cross-motion for summary judgment is allowed and denied in part. The petition is dismissed with respect to the claims totalling $88,336.76 which the plaintiff submitted in the administrative proceedings, with the exception of the claims relating to alleged loss of post-contract salary and the alleged loss due to the so-called time utilization factor, which claims are reserved for further consideration and disposition in the subsequent judicial proceedings relating to the alleged breach of contracts 373 and 374. Of course, the court intimates no opinion as to whether plaintiff will be able to establish its breach claims.[4]

The case is remanded to the Trial Division for further proceedings.

---

4. Insofar as the petition is dismissed, the Board's determination (as construed and upheld *supra*, Parts VI and VII) can properly be considered to preclude (by way of collateral estoppel) relitigation in the breach suit of the precise factual issue decided by the Board adversely to plaintiff. However, as held in Part III, *supra* the Board's determination that plaintiff defaulted will not estop the plaintiff from proving and recovering on its breach claims, if it can.