# United States Court of Appeals for the Federal Circuit

———————————

**ZAFER TAAHHUT INSAAT VE TICARET A.S.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2015-5083

———————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00888-TCW, Judge Thomas C. Wheeler.

———————————

Decided: August 17, 2016

———————————

SAM GDANSKI, Gdanski & Gdanski LLP, Teaneck, NJ, argued for plaintiff-appellant.

AGATHA KOPROWSKI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., DEBORAH A. BYNUM; JAMES D. STEPHENS, MICHAEL A. REAS, Middle East District, United States Army Corps of Engineers, Winchester, VA.

———————————

Before LOURIE, DYK, and STOLL, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Zafer Taahhut Insaat ve Ticaret A.S. ("Zafer") appeals from the U.S. Court of Federal Claims's ("Claims Court") (1) grant of summary judgment that the U.S. Army Corps of Engineers ("USACE") did not constructively change the terms of its contract with Zafer; and (2) denial of Zafer's motion to supplement the record with several newspaper articles. *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 120 Fed. Cl. 604, 612 (2015). For the reasons that follow, we affirm.

## BACKGROUND

Zafer is an experienced construction contractor located in Ankara, Turkey. In May 2011, USACE entered into a firm-fixed-price contract with Zafer, No. W912BU-11-C-0017, to construct the MILCON Consolidated Community Support Facility at the Bagram Air Force Field in Afghanistan. Under the terms of the contract, Zafer was responsible for delivering construction materials to the project's site, and assumed the risk "for all costs and resulting loss or profit." *See* 48 C.F.R. § 16.202-1. Further, the contract incorporated several standard Federal Acquisition Regulation ("FAR") provisions, such as a Changes clause, FAR 52.243-4, a Default clause, FAR 52.249-10, and an F.O.B. Destination clause, FAR 47.303-6.

The Default clause is of particular relevance here. It provides, in pertinent part:

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. . . . ; and

(2) The Contractor, within 10 days from the beginning of any delay . . . , notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. . . .

48 C.F.R. § 52.249-10(b) (2007).

In June 2011, Zafer received a notice to proceed with the contract, with a contract completion date in November 2012. USACE later recognized that it could not make the project site available until June 2012, and it accordingly issued a bilateral modification that increased the contract price and set a new completion date in October 2013.

In November 2011, the government of Pakistan closed its border from the seaport city of Karachi along the land routes into Afghanistan ("the Karachi/Afghan route") in response to a combat incident with the U.S. and the North Atlantic Treaty Organization ("U.S./NATO incident") that allegedly killed twenty-four Pakistani citizens. The route remained closed for 219 days, until July 2012.

By letter dated March 20, 2012, Zafer notified USACE that the closure of the Karachi/Afghan route would greatly impact its delivery of materials, as required under the contract. *See* Joint App. ("J.A.") 29–30. Specifically, Zafer noted that the "unexpected closure" of the Karachi/Afghan route grossly affected its logistics because a "considerable amount of project materials/equipment are stuck at the Pakistan border." J.A. 29. As Zafer indicated, "[n]ineteen (19) of [the twenty-four] shipments are already at Karachi and have not been allowed to move for a long time." J.A. 29. Zafer then requested direction on how to proceed, *e.g.,* if it should ship via another route with increased shipping time and associated costs. J.A. 30.

USACE replied on June 27, 2012, acknowledging the difficulties arising from the closure of the Karachi/Afghan route.  J.A. 31.  It informed Zafer, however, that because the closure was "purely the act of Pakistan governmental authorities," and the U.S. government was "not responsible for these sovereign acts of a foreign nature," Zafer was nevertheless obliged to deliver the materials and supplies by "any means necessary," without further compensation.  J.A. 31.  USACE then stated that its contract with Zafer allows for a non-compensable time extension in the event of an unforeseeable delay.  *See* J.A. 31 (referencing the Default clause, FAR 52.249-10).  And, if Zafer "believe[s] that [it is] entitled to a non-compensable extension of time to perform . . . [, it] may submit a request to the [contracting officer]."  J.A. 31.  USACE specified that any request "must fully explain why the delay was unforeseeable" and "include documentation of the date when the materials or equipment were shipped and when the delay began at the Pakistan border."  J.A. 31.

Soon thereafter, on July 11, 2012, Zafer responded to USACE's letter.  Zafer acknowledged that, by July 11, the Karachi/Afghan route had reopened, but stated: "We want to put [USACE] on notice of Zafer's entitlement to additional time, but also several additional entitlements for increased costs occasioned by the border closing."  J.A. 32.  Zafer then outlined several categories of costs, including constructive acceleration costs, port detention and demurrage, and extended overhead.  J.A. 32.  It finally concluded its letter by challenging USACE's position that USACE was not responsible for any additional costs incurred.  *See* J.A. 33–34.

USACE did not immediately respond to Zafer's July 11, 2012 letter.  So, on October 24, 2012, Zafer sent another letter to USACE with an update, indicating that the materials and equipment held at the Karachi port "have now begun the process of being released back into normal distribution," and that the Pakistan government demands

"extra payment before [it] will release these shipments." J.A. 36. Zafer asked for payment to cover the additional costs, and for direction on how to proceed. J.A. 36.

That same day, October 24, USACE replied, repeating its earlier, June 27, 2012 letter. USACE stated that Zafer remains responsible for delivering all materials "by whatever means necessary," and that USACE "will not assume responsibility for any increased costs of delivering construction material and equipment." J.A. 37. USACE last noted that, under the terms of the contract, Zafer could request a non-compensable time extension, and that any request should "explain why the delay was unforeseeable" and "include documentation of the date when the materials or equipment were shipped and when the delay began." J.A. 37.

Zafer replied on October 31, 2012, challenging whether USACE should bear responsibility for increased costs. In particular, Zafer argued that the border closure was not solely the result of "acts of a sovereign not under the control of the US," but rather a result "of US/NATO firing accident." J.A. 38. It reiterated that it "wishe[d] to put USACE on notice of Zafer's entitlement to additional time and also additional entitlement for increased costs." *See* J.A. 39 ("Zafer will, under protest, ship its material from Karachi to Bagram expeditiously but reiterates its position more fully outlined in its July 11, 2012, Serial Letter 23 that it is entitled to additional time and will look to the Government to recoup the increased costs occasioned by the border closing.").

On February 22, 2013, Zafer submitted a request for an equitable adjustment to the contracting officer. In its request, Zafer "asserted that the Government is liable for [the] increased costs of re-procurement, shipping, D&D (detention and demurrage) and warehousing" occasioned by the Karachi/Afghan route closure. J.A. 41. Zafer again reiterated its belief that the U.S. government was respon-

sible for the route closure, and thus for any increased costs that Zafer consequently incurred. J.A. 41. On May 20, 2013, after three months with no response from USACE, Zafer resubmitted its request for an equitable adjustment, expressly "request[ing] a Contracting Officer's decision." *See* J.A. 46. Zafer included a certification with its request and thus "consider[ed] the proposal a Claim." J.A. 46. On July 25, 2013, the contracting officer denied the claim, finding that no evidence supported a constructive change claim, and stating that "Zafer made a business decision to continue to procure materials and ship through Karachi," despite its knowledge of the closure. J.A. 17–21; *see also Zafer*, 120 Fed. Cl. at 608.

Zafer consequently filed a complaint in the Claims Court on November 8, 2013, alleging, *inter alia*, that USACE constructively changed the terms of the contract. Specifically, Zafer set forth two grounds for constructive change: (1) USACE constructively accelerated the contract when it ordered Zafer to perform despite the delays occasioned by the Karachi/Afghan route closure; and (2) the delay is the fault of the U.S. government because it caused the route closure (the U.S./NATO incident) and it ineffectively negotiated with Pakistan to reopen the route quickly. *See Zafer*, 120 Fed. Cl. at 610. USACE moved to dismiss for failure to state a claim, or alternatively, for summary judgment. *See id.* at 608. Zafer filed a response and moved to supplement the record. *Id.*

The Claims Court granted USACE's motion for summary judgment, concluding that Zafer could not establish that USACE constructively changed the terms of the contract.[1] *Id.* at 610. First, the court held that Zafer did

---

[1]    The Claims Court noted that USACE's motion for summary judgment more properly disposed of the issue, for both parties "submitted and relied upon documentary

not have a valid constructive acceleration claim because: (1) Zafer's claimed costs only arose from shipping and storage, not performance; (2) the contract did not specify the use of the Karachi/Afghan route, and thus USACE's demand to complete the delivery by "whatever means necessary" did not require a method of shipping beyond that required in the contract; and (3) USACE did not deny any request for additional time. *Id.* The court then held that Zafer did not establish that the U.S. government was responsible for the delays because: (1) another sovereign, not the U.S. government, closed the Karachi/Afghan route; and (2) the U.S. government was not acting in its "contractual capacity" when it negotiated with Pakistan to reopen the route. *See id.* at 610–11. The court lastly denied Zafer's motion to supplement the record because the proffered newspaper articles and social media sources constituted inadmissible hearsay and were barred by the parol evidence rule. *See id.* at 611–12.

Zafer timely appealed; we have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

Zafer first challenges the grant of summary judgment to USACE of no constructive change. *See* Oral Argument at 2:25–2:34 (constructive acceleration claim); Appellant's Br. 7–24 (constructive change, generally). For the reasons that follow, we affirm the grant of summary judgment.

We review *de novo* the Claims Court's grant of summary judgment, drawing all factual inferences in favor of the nonmovant. *See Anderson v. United States*, 344 F.3d 1343, 1349 (Fed. Cir. 2003). Summary judgment is proper

---

evidence and pleadings beyond Zafer's complaint." *Zafer*, 120 Fed. Cl. at 608.

when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).

"A firm-fixed price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing," 48 C.F.R. § 16.202-1, and generally sets forth a fixed scope of work. Nevertheless, a contracting officer may adjust "the work within the general scope of the contract" under a Changes clause, *id.* § 52.243-4(a), and the contractor may receive an equitable adjustment for changes contemplated by that clause, *id.* § 52.243-4(c)–(e); *see, e.g.*, *id.* § 52.243-4(a)(4) ("Directing acceleration in the performance"). The contracting officer typically effectuates such a change by submitting a formal change order to the contractor. *Id.* § 52.243-4(b).

Even absent a formal order under the Changes clause, the contracting officer may still *constructively* change the contract, "either due to an informal order from, or through the fault of, the government." *NavCom Def. Elecs., Inc. v. England*, 53 F. App'x 897, 900 (Fed. Cir. 2002); *see Metric Constr. Co., Inc. v. United States*, 81 Fed. Cl. 804, 817 n.19 (2008) ("The theory of constructive change developed by judicial evolution. In cases where the contract work was actually changed but the procedures of a changes clause in the contract were not followed, early appeals boards found that a change had been 'constructively' ordered.") (citation omitted). Zafer invokes both grounds for a constructive change, and we address each in turn.

First, an informal order to accelerate contract performance (constructive acceleration) can effect a constructive change to the contract requiring an equitable adjustment. *Accord Fraser Constr. Co. v. United States*, 384 F.3d 1354, 1360–61 (Fed. Cir. 2004). Constructive acceleration often occurs when the government demands compliance with an original contract deadline, despite excusable delay by the contractor. *See id.* at 1361. We have set forth five ele-

ments that a contractor must prove to successfully allege a constructive acceleration claim:

> (1) that the contractor encountered a delay that is excusable under the contract; (2) that the contractor made a timely and sufficient request for an extension of the contract schedule; (3) that the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) that the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) that the contractor was required to expend extra resources to compensate for the lost time and remain on schedule.

*Id.* (citations omitted).

Zafer first argues that USACE's repeated "by whatever means necessary" statement required Zafer to perform work beyond that required in the contract, which implicitly required all shipping to occur exclusively via the Karachi/Afghan route. Appellant's Br. 13–20 (invoking *Appeal of Dougherty Overseas, Inc.*, 68-2 B.C.A. P 7165, ENGBCA 2625, 1968 WL 445 (May 2, 1968), and *Appeal of Alley-Cassetty Coal Co.*, 89-3 B.C.A. P 21964, ASBCA No. 33315, 1989 WL 74890 (May 10, 1989), for support). Zafer next challenges the Claims Court's determination that the claimed costs arose exclusively from storage and shipping, and that USACE did not deny a request for a time extension.[2] *E.g.*, *id.* at 15–16, 18.

---

[2] The Claims Court indicated that "Zafer received a reasonable time extension due to the border closure," and

USACE responds first that Zafer failed to present any evidence showing that USACE demanded additional work because the contract did not specify a particular transportation route, and USACE, at most, insisted on compliance with the express terms of the contract. *See* Appellee's Br. 13–18. USACE then contends that Zafer likewise did not present any evidence showing that it spent additional resources to stay on track, *id.* at 19–20, did not submit a request for an extension of time, *id.* at 20–22, and did not establish that USACE denied its request for an extension of time, *id.* at 22–24.

As we set forth in *Fraser*, a contractor must prove all five elements to allege a successful constructive acceleration claim. 384 F.3d at 1361. Thus, an entry of summary judgment is appropriate against a contractor "who fails to make a showing sufficient to establish the existence of an essential element to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). That is so, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Because Zafer failed to designate specific facts sufficient to establish that USACE denied a request for a time extension, we affirm the Claims Court's conclusion that Zafer failed to establish a constructive acceleration claim.

---

thus there was no improper denial by USACE. *Zafer*, 120 Fed. Cl. at 610. Zafer argues that the extension granted in bilateral modification P00004 was not because of the route closure. *See* Appellant's Br. 13. USACE concedes as much. *See* Appellee's Br. 22. Although we agree that the Claims Court erred in this respect, we still affirm its ultimate conclusion that USACE did not deny a request for a time extension, for the reasons that follow.

As described above, Zafer and USACE had significant correspondence concerning the route closure. Zafer first alerted USACE to the associated complications in March 2012. USACE acknowledged the difficulties and informed Zafer that, pursuant to the contract, Zafer could request a non-compensable time extension. Most notably, USACE requested Zafer "fully explain why the delay was unforeseeable" and provide all "documentation of the date when the materials or equipment were shipped and when the delay began at the Pakistan border." J.A. 31. Those demands are entirely consistent with the contracting officer's duty to make specific factual determinations regarding the delay, such as whether a time extension is proper and, if so, how much time should be awarded. 48 C.F.R. § 52.249-10(b)(1)–(2). Indeed, though not required, contractors requesting a time extension for an excusable delay regularly ask for a specific time frame to ameliorate the harms of delay. *See, e.g.*, *Azure v. United States*, 129 F.3d 136, 1997 WL 665763, at *4 (Fed. Cir. Oct. 24, 1997) (table) ("In a letter dated July 15, 1993, Azure requested a time extension of seventeen calendar days."); *Appeal of Trepte Constr. Co., Inc.*, 90-1 B.C.A. P 22595, ASBCA No. 38555, 1990 WL 101600 (Jan. 4, 1990) (asking for a 150-day time extension); *Stroh Corp. v. Gen. Servs. Admin.*, 96-1 B.C.A. P 28265, GSBCA No. 11029, 1996 WL 154494 (Mar. 29, 1996) (asking for a 130-day time extension).

In response, Zafer set forth the reasons for the delay, proclaimed its "entitlement to additional time," and asked for compensation for all "increased costs occasioned by the border closing." J.A. 32–34. Notably, however, Zafer did not ask for a specific amount of time. J.A. 32–34; *see also* Oral Argument at 3:16–3:28 (When asked if Zafer asked for a specific time extension, its counsel responded "no."). A few months later, USACE responded and reiterated its earlier request for "documentation of the date when the materials or equipment were shipped and when the delay began" so that it could assess whether a time extension

might be warranted. J.A. 37. Zafer replied, asking again for additional monies, yet failing again to describe a time frame. *See* J.A. 39. At most, Zafer "put USACE on notice of [its] entitlement to additional time," generally. J.A. 39. Soon thereafter, Zafer submitted a request for an equitable adjustment and initiated the proper procedures under the Contract Disputes Act. *See* J.A. 41, 46.

On the facts as they have been alleged, and after construing them all in the light most favorable to Zafer, we must conclude that there is no genuine factual dispute indicating that USACE improperly denied a request for a time extension. To the extent that Zafer's repeated "notice of entitlement to additional time" amounts to a "timely and sufficient request for an extension" under *Fraser*, 384 F.3d at 1361, no facts indicate that USACE denied the request. The submitted correspondence simply reflects an ongoing conversation between the contractor and the U.S. government, an ongoing conversation aimed at resolving the obvious issues presented by the Karachi/Afghan route closure. None of the letters reveal an express or even an implied statement by USACE that a request for a time extension was denied. *Compare Appeal of Cont'l Heller Corp.*, 84-2 B.C.A. P 17275, GSBCA No. 7140, 1984 WL 13283, at ¶ 22 (Mar. 23, 1984) ("Until the requirements noted above are met . . . , your request for a contract time extension is denied."). Rather, the contracting officer repeatedly asked for more information so that it could make a proper determination, a request that Zafer repeatedly failed to comply with. We decline to accept that remarks made by a contracting officer in an ongoing conversation such as this amount to a denial of an extension of time for purposes of a constructive acceleration claim. Zafer failed to allege any facts beyond the above-mentioned conversation to establish that USACE improperly denied its request. Accordingly, Zafer's constructive acceleration claim fails.

Next, a constructive change may result through the fault of the government that warrants an equitable adjustment to the contract. *NavCom*, 53 F. App'x at 900. Zafer argues that the U.S. government is at fault for the delay because the U.S./NATO incident led to the route closure, and the U.S. government prolonged the delay when it acted in its contractual capacity during negotiations with Pakistan to reopen the route. *See, e.g.*, Appellant's Br. 8 ("The US and Pakistan engaged in long arduous and at times contentious negotiations for reparations and other payments to Pakistan, and most likely individuals, businesses and other affected parties."). In support of its argument, Zafer relies only on newspaper articles and social media sources detailing the closure and negotiation. *See, e.g., id.* at 11 (referring to a New York Times article and e-mails from a shipping agent discussing the hold-up of cargo at the port of Karachi); *id.* at 29 (referring to a New York Times article suggesting that the U.S. "withdrew a team because negotiations were stalemated after trying to obtain the opening of the border").

We find neither of Zafer's arguments to be persuasive. First, the U.S. government was not responsible for the route closure. As both parties have acknowledged, the Pakistan government alone closed the route, *Zafer*, 120 Fed. Cl. at 610–11, and the U.S. government is not responsible for the sovereign acts of a foreign nation. Zafer has failed to proffer any evidence suggesting otherwise.

Second, the U.S. government is typically not responsible for any "obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *See Conner Bros. Constr. Co., Inc. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008) (citation and quotation marks omitted)*; Jones v. United States*, 1 Ct. Cl. 383, 385 (1865) ("[T]he United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign."). An exception, however, to this "sovereign acts defense" is that the government may

be responsible for an act "specifically directed at nullifying contract rights." *Id.* at 1374–75; *see United States v. Winstar Corp.*, 518 U.S. 839, 896 (1996) ("The sovereign acts doctrine thus balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as a contractor."); *Conner*, 550 F.3d at 1374 ("[C]ourts addressing the sovereign acts doctrine have looked to the extent to which the governmental action was directed to relieving the government of its contractual obligations."); *City Line Joint Venture v. United States*, 503 F.3d 1319, 1323 (Fed. Cir. 2007) (finding that legislation abrogating the option of low-income apartment owners to prepay their mortgages was not a sovereign act because it was "aimed at the contract rights themselves in order to nullify them").

In this case, Zafer has not alleged any facts indicating that the U.S. government's negotiations with Pakistan to reopen the route were "specifically directed at nullifying contract rights." For example, it does not allege that the governmental action at issue "applie[d] exclusively to the contractor" rather than "more broadly to include other parties not in a contractual relationship with the government." *See, e.g.*, *Conner*, 550 F.3d at 1375 (citing *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1576 (Fed. Cir. 1997)); *see also Horowitz v. United States*, 267 U.S. 458, 461 (1925) ("Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specifically to alter, modify, obstruct or violate the particular contracts into which it enters with private persons."). Instead, Zafer made broad and unsubstantiated allegations that the U.S. "contractually interfered, hindered, delayed, [sic] resolution of the border clos[ure] [issue]." *See Zafer,* 120 Fed. Cl. at 611 (alterations in original) (citation and quotation marks omitted). That is insufficient to survive a motion for summary judgment.

For the reasons set forth above, Zafer failed to designate specific facts to establish a constructive change claim based on either a constructive acceleration theory or on a government fault theory. We therefore affirm the Claims Court's grant of summary judgment to USACE.

## II

Zafer next challenges the Claims Court's denial of its motion to supplement the record with several newspaper articles and social media sources. *See* Appellant's Br. 23, 25–33. Zafer contends that the articles and sources show that its contract necessarily contemplated only the Karachi/Afghan route, *see, e.g.*, *id.* at 26–28, and that the U.S. government acted in its contractual capacity when it was negotiating with Pakistan to reopen the route, *see, e.g.*, *id.* at 8, 10–12, 29.

We review evidentiary determinations by the Claims Court for an abuse of discretion. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1378 (Fed. Cir. 2009) (quoting *Murakami v. United States*, 398 F.3d 1342, 1346 (Fed. Cir. 2005)). An abuse of discretion is found when (1) the court's decision is "clearly unreasonable, arbitrary, or fanciful," (2) the court's decision is "based on an erroneous conclusion of the law," (3) the court's findings are clearly erroneous, or (4) the record contains no evidence "upon which the [court] rationally could have based its decision." *See Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1341 (Fed. Cir. 1999). We find no abuse of discretion in the Claims Court's decision here to deny Zafer's motion to supplement the record.

The Claims Court denied Zafer's motion to introduce several newspaper articles and social media sources into the record for two reasons: hearsay and the parol evidence rule. *Zafer*, 120 Fed. Cl. at 612. Zafer does not meaningfully challenge either determination now on appeal. First, Zafer invokes Federal Rule of Evidence 902 (evidence that is self-authenticating), alleging that the Claims Court did

not consider the self-authenticating nature of the articles and sources when it dismissed them as hearsay. *See, e.g.*, Appellant's Br. 27. But that invocation entirely misses the point of the hearsay determination. *Compare* Fed. R. Evid. 801(c), 802, *with* Fed. R. Evid. 902. Authentication and hearsay are two separate requirements, and Zafer's conflation of the two does not provide a meaningful basis for finding that the Claims Court abused its discretion.

Zafer's challenge to the Claims Court's application of the parol evidence rule similarly fails. The parol evidence rule "renders inadmissible evidence introduced to modify, supplement, or interpret the terms" of a fully integrated, unambiguous agreement. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1373 (Fed. Cir. 2004). Zafer does not contend that its contract was ambiguous or not integrated. Instead, Zafer simply assumes the conclusion and contends that the articles and sources highlight what the parties "clearly" contemplated. *E.g.*, Appellant's Br. 32. Because Zafer fails to provide a meaningful basis for finding that the Claims Court abused its discretion, we affirm the court's denial of Zafer's motion to supplement the record.

## CONCLUSION

We have considered Zafer's remaining arguments, but find them unpersuasive. For the reasons set forth above, we affirm the Claims Court's grant of summary judgment and its denial of Zafer's motion to supplement the record.

**AFFIRMED**