# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
IAP Worldwide Services, Inc. ) ASBCA Nos. 59397, 59398, 59399
)
Under Contract No. W912BU-10-D-0018 )

APPEARANCES FOR THE APPELLANT: J. Alex Ward, Esq.
    Ethan E. Marsh, Esq.
      Morrison & Foerster LLP
      Washington, DC

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
      Engineer Chief Trial Attorney
    Amanda G. Phily, Esq.
    Maria Kolokithias, Esq.
      Engineer Trial Attorneys
      U.S. Army Engineer District, Philadelphia

## OPINION BY ADMINISTRATIVE JUDGE MELNICK

IAP Worldwide Services, Inc. (IAP) contracted with the United States Army Corps of Engineers to provide power plants at forward military bases in Afghanistan. It had historically shipped such equipment into the country from Pakistan. After IAP received a notice to proceed for three of that contract's delivery orders, Pakistan closed its border in response to a military attack. The border remained closed seven months. IAP seeks recovery "for the costs it incurred to deal with the closure." The parties submitted the appeal for decision under Board Rule 11. Only entitlement is at issue. Repeated government denials and inadequate extensions of IAP's delivery order performance periods after the border closed accelerated its performance, thereby rendering the government liable for the costs associated with the aforementioned actions.

## FINDINGS OF FACT

1. On 13 September 2010, the U.S. Army Engineer District, Philadelphia, awarded indefinite-delivery, indefinite-quantity (IDIQ) contract, No. W912BU-10-D-0018 to IAP (Shank R4, tab 1).[1] The contract was for the support of "all generator set activities and overhead distribution and transmission for power operations in support of military

---

[1] The government provided separate Rule 4 files for the three task orders at issue, which involve Forward Operating Bases Shank, Dwyer, and Sharana.

contingencies." Those requirements included power plants and "all labor, transportation, equipment, and supervision." (*Id.* at 74) The contract's scope was world-wide (*id.* at 77). Performance under the contract could only be authorized through task orders issued by contracting officers (*id.* at 89). Among the provisions incorporated into the contract by reference were FAR 52.247-34, F.O.B. DESTINATION (NOV 1991); FAR 52.242-17, GOVERNMENT DELAY OF WORK (APR 1984); FAR 52.243-1, CHANGES—FIXED-PRICE (AUG 1987); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) (*id.* at 87, 92).

2. On 23 September 2011, Ms. Catherine Schoenherr, Chief of the Supplying Services Branch for the Philadelphia district, and a contracting officer, issued Delivery Order No. 0004 to IAP. The order required IAP to supply a 10-megawatt generator set (expandable to 20), including materials for transmission and distribution of power, for Forward Operating Base (FOB) Shank, Afghanistan. (Shank R4, tab 2; app. supp. R4, tab 46, Schoenherr dep. at 2917) Consistent with the IDIQ, IAP was to perform all logistics, including loading, hauling, and unloading equipment (Shank R4, tab 2 at 110). IAP was to commission the plant and place it into service within 120 days of a notice to proceed, and the period of performance would be 365 days. The fixed price was $19,531,390. (Shank R4, tab 2 at 106, 127-28) The government issued the notice to proceed on 26 September 2011, establishing 24 January 2012 as the initial commissioning date (Shank R4, tab 29, Parker aff. at 377, ¶ 8).

3. On 23 September 2011, Ms. Schoenherr also issued Delivery Order No. 0005. IAP was to supply a 5-megawatt power plant at FOB Dwyer, Afghanistan, and then expand it to 15 megawatts (ultimately expandable to 20) (Dwyer R4, tab 2). IAP's responsibilities included "preparation, transport, [and] installation" (*id.* at 93). IAP was to commission the 5-megawatt plant and place it into service within 90 days of receipt of the notice to proceed and commission the 10-megawatt expansion within 150 days of that notice. The period of performance was 365 days and the fixed price was $12,398,249. (*Id.* at 90, 92) The government issued the notice to proceed on 18 November 2011, establishing 17 April 2012 as the initial commissioning date for the complete 15-megawatt plant (supp. R4, tab 32; app. supp. R4, tab 10 at 2031-32).

4. On 26 September 2011, Ms. Schoenherr issued Deliver Order No. 0008. It required IAP to supply and support all generator set activities for 12.5 megawatts of power (expandable to 15) at FOB Sharana, Afghanistan. The delivery order included preparation, transport, and installation. (Sharana R4, tab 2 at 91) IAP was to commission and place the equipment into service within 160 days from receipt of a notice to proceed. The period of performance was 365 days with four option years. The fixed price for the initial period of performance was $16,231,015.11. (*Id.* at 90) The government issued the notice to proceed on the date the delivery order was issued, establishing 4 March 2012 as the initial commissioning date (Sharana R4, tab 8, Parker aff. at 240, ¶ 7).

5. The delivery orders incorporated IAP's proposals, which explained that it would obtain generators from Aggreko International. Aggreko operated a distribution point in the United Arab Emirates (UAE). (App. supp. R4, tab 41, gov't reply to app. first req. admissions at 2220, ¶ 17, tab 45, Eckhardt dep. at 2751; Shank R4, tab 2 at 106, tab 8 at 236; Dwyer R4, tab 2 at 90, tab 6 at 275; Sharana R4, tab 2 at 90, tab 5 at 138) IAP's Shank and Dwyer proposals stated that Aggreko would "ship their equipment 45-90 days prior to mobilization depending upon the conditions at the border and the shipping route" (Shank R4, tab 8 at 236; Dwyer R4, tab 5 at 215). The Sharana proposal stated that "power equipment [would] be surface shipped to and then trucked to the site" (Sharana R4, tab 5 at 139). The Corps' program manager, Mr. Thomas Gibison, understood IAP's Shank and Dwyer proposals to contemplate use of the Pakistan route (app. supp. R4, tab 43, Gibison dep. at 35-36).

6. The generators necessary for each task order required extensive shipments. For example, the 10-megawatt plant for FOB Shank required fifty-two 40 foot by 8 foot by 8½ foot shipping containers (app. supp. R4, tab 48, Kelly decl. ¶ 21). There were three methods to transport such materials to bases in Afghanistan. First was the Pakistan route. Containers went by ship from Jebel Ali in the UAE to Karachi, Pakistan. They were then loaded onto trucks and carried across the Pakistan-Afghanistan border at one of three crossings: Chaman, Torkham, or the Kyber Pass. From there, they proceeded to the appropriate FOB. (App. supp. R4, tab 47, Hammerle aff. ¶ 13, tab 48, Kelly decl. ¶ 22). IAP had always used this route for power services contracts in Afghanistan, relying upon it to transport equipment to 14 locations in Afghanistan as a prime contractor or subcontractor on Philadelphia District contracts (app. supp. R4, tab 47, Hammerle aff. ¶ 13, tab 49, Bannister decl. ¶¶ 6-9). Typically, the shipment took between 30 and 60 days (app. supp. R4, tab 47, Hammerle aff. ¶ 13, tab 48, Kelly decl. ¶ 22, tab 49, Bannister decl. ¶ 13).

7. The second transport method is referred to as the Northern Distribution Network (NDN). It refers to a set of routes that could start in Turkey, Georgia, or even Latvia and then travel through several possible Eastern European or Asian countries, such as Georgia, Azerbaijan, Russia, Belarus, Kazakhstan, Uzbekistan, Turkmenistan, Kyrgyzstan, and Tajikistan. Prior to the events of this appeal, IAP had never used the NDN to transport power equipment into Afghanistan because it knew these various routes took more time and cost more than the Pakistan route, and posed more risk due to the number of countries involved. (App. supp. R4, tab 48, Kelly decl. ¶¶ 23-25) The government concedes that shipping by the NDN was more expensive and required more time than shipping by the Pakistan route (app. supp. R4, tab 41, gov't reply to app. first req. admissions at 2222, ¶¶ 22-23).

8. Air transport was the third, fastest, and most expensive method to transport power equipment. It took about two weeks to fly equipment into Kandahar,

3

Afghanistan, and then truck it to an FOB. However, generators are large and heavy. Using air would have added about $4,000,000 in costs to each task order. (App. supp. R4, tab 48, Kelly decl. ¶ 26)

9. Consistent with its past practice, and need to bid a competitive price, IAP based each of the task order proposals on using the Pakistan route (app. supp. R4, tab 48, Kelly decl. ¶ 31). Accordingly, the Shank generators departed the UAE on 7 November 2011 and arrived in Karachi in mid or late November (app. supp. R4, tab 47, Hammerle aff. ¶ 16, tab 48, Kelly decl. ¶ 31, tab 49, Bannister decl. ¶ 17). Normal customs clearance procedures likely would have led to the generators' release for transport to the Afghanistan border in mid-December (app. supp. R4, tab 49, Bannister decl. ¶ 17). IAP also arranged for Aggreko to prepare generators for transport to Dwyer and Sharana, but they were not scheduled to ship until early December 2011 (app. supp. R4, tab 47, Hammerle aff. ¶ 17, tab 48, Kelly decl. ¶ 32).

10. On 28 November 2011, Pakistan closed the Port of Karachi, and the land routes from that city into Afghanistan, to United States and North Atlantic Treaty Organization (NATO) military shipments, in response to a combat operation by the United States and NATO (app. supp. R4, tab 47, Hammerle aff. ¶ 18, tab 45, Kelly decl. ¶ 33). *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States,* 833 F.3d 1356, 1359, 1364 (Fed. Cir. 2016). In response, Mr. Robert Hammerle, IAP's Vice President, halted the shipments of additional generators for Dwyer and Sharana (app. supp. R4, tab 47, Hammerle aff. ¶¶ 2, 18, tab 45). The next day, Mr. Hammerle sent an email to Ms. Karyn Price, the Corp's contracting officer, notifying her that a more formal letter would be forthcoming about the border. Mr. Hammerle stated in the email that the Shank generators were in Karachi but could not move forward into Afghanistan. Also, the border closure would soon effect both the Dwyer and Sharana schedules. He requested Ms. Price's guidance. Mr. Hammerle considered his options to be, to return the Shank equipment to Aggreko until the border opened and receive schedule relief, and/or fly the Shank and Dwyer generators into Afghanistan, which would require more funding. (Shank R4, tab 10) Ultimately, it became clear that not only were the Shank generators barred from proceeding to the Afghanistan border, but they were detained in the Port of Karachi until the border reopened. Thus, they were essentially trapped. (App. supp. R4, tab 47, Hammerle aff. ¶ 18, tab 49, Bannister decl. ¶ 18)

11. In a 6 December 2011 letter to Ms. Price, Mr. Shelley Parker, IAP's contract manager, notified her that "the border closing between Pakistan and Afghanistan [was causing] delays in transporting [IAP's] power plant equipment into Afghanistan." He explained that the Shank equipment had already been delayed in Karachi for two weeks, the Dwyer generators' departure from the UAE had been delayed, and that the Sharana departure likely would be too. He contended the border closure was beyond the control of IAP, and therefore it expected a delivery schedule

4

adjustment. Given the uncertainty about the border reopening, Mr. Parker suggested using air freight to transport the equipment at an estimated $7.4 million cost. (Shank R4, tab 11) Subsequently, IAP estimated for Mr. Gibison that use of the NDN for Dwyer and Sharana would cost approximately $1,044,000, while using airfreight would cost around $4,400,000 for those two task orders (app. supp. R4, tab 9).

12. Ms. Schoenherr interpreted Mr. Parker's letter to request a schedule change for all three task orders (app. supp. R4, tab 46, Schoenherr dep. at 2962-63). Nevertheless, her 22 December 2011 response (drafted by Ms. Price) reminded Mr. Parker the contract was fixed price, and that "FAR 52.247-34 (F.O.B. Destination) governed the transport of equipment." She would give no other advice about what IAP should do. (Shank R4, tab 12; app. supp. R4, tab 44, Price dep. at 2676-77).

13. There was at least one telephone call between IAP and Ms. Price about the border closure after Mr. Parker's 6 December letter. During that call, Ms. Price informed IAP that it must fulfill its contractual obligations and would not be granted any extension of the task order periods of performance. She also stated that if IAP failed to meet the established performance deadlines it would be in default. (App. supp. R4, tab 43, Gibison dep. at 2441-45, tab 44, Price dep. at 2673-79)

14. Given the government's refusal to grant any extensions, and threats of default, in late December 2011, Mr. Hammerle instructed Aggreko to proceed with shipping the Dwyer and Sharana generators via the NDN. The containers left Jebel Ali in late January 2012 and followed a route through Turkey IAP had never used before. (App. supp. R4, tab 47, Hammerle aff. ¶¶ 19-20; Sharana R4, tab 15; Dwyer R4, tab 14) The Dwyer generators arrived on site about four months later, in late May, and the parties certified the commissioning of the plant on 1 June (app. supp. R4, tab 47, Hammerle aff. ¶ 21, Dwyer R4, tab 17). The Sharana generators also arrived on site in late May and early June, and were certified by the parties for commissioning on 12 July 2012 (Sharana R4, tab 21). It is undisputed that IAP incurred additional costs shipping the Sharana and Dwyer generators via the NDN instead of over the Pakistan route (app. prop. finding 41).

15. By email dated 5 January 2012, Mr. Hammerle informed government personnel, including Ms. Price, that it had shipped the Dwyer generators via the NDN following the military attack by the United States and border closure, which it considered to be a changed condition beyond IAP's control (app. supp. R4, tab 10). On 13 January 2012, Mr. Hammerle repeated IAP's view to, among others Ms. Price and Mr. Gibison, that the border closure was caused by the attack, creating a "changed condition" (Shank R4, tab 14 at 298-99). In another letter to Ms. Price regarding Sharana, dated 18 January, Mr. Parker reiterated that the border closure was an excusable delay beyond IAP's control (Sharana R4, tab 15 at 304).

16. In an email to Mr. Hammerle dated 20 January 2012, Ms. Price opined that the border closure was not an excusable delay, stating that IAP was "to do everything in its power to get the materials on site and mobilize as quickly as possible" (Shank R4, tab 14 at 298). In another message to Mr. Hammerle that day she stressed IAP's duty to "do everything in [its] power to make delivery and perform," declaring that "otherwise IAP will be in a default situation." She continued that "IAP is requested to fulfill their contractual obligation as quickly as possible," but "[s]ince we have no idea when the border will reopen, waiting for the Karachi border to reopen is probably not in your best interest." (App. supp. R4, tab 46 at 03146) Ms. Price did indicate that IAP would be given a total of 275 days to commission Shank due to unrelated changed conditions regarding the placement of distribution infrastructure on the site (Shank R4, tab 14 at 297-98).

17. In a letter to Ms. Price dated 25 January 2012, Mr. Parker expressed IAP's disagreement with her refusal to acknowledge an excusable delay arising from the border closure. Mr. Parker argued that it was reasonable for IAP to wait for the border to reopen because it was commercially impracticable to extract its generators from Karachi. However, given Ms. Price's 20 January insistence that IAP do everything in its power to perform, or otherwise risk default, IAP could ship a second set of generators through the NDN. Nevertheless, Mr. Parker requested further discussion about the shipping schedule due to the independent delays completing the distribution system on site. (Shank R4, tab 15)

18. After the first of February 2012, further discussions between government counsel, contracting, and the programs management division, led the government to change its position and decide that the border closure was an excusable delay (supp. R4, tab 33, Eckhardt aff. ¶ 7, tab 36, Gibison aff. ¶ 18). By letter to IAP dated 16 February 2012, regarding Delivery Order 0008 (Sharana R4, tabs 16-17), Ms. Schoenherr stated that "[i]t is the Government's position that the border delay is an excusable delay for contract performance but not compensable." She therefore concluded that "[t]he Government will approve a non-compensable delay of 75 calendar days to the Pakistan border closure and provided a total of 275 day" She warned that "[t]his acceptable delay...is a onetime action, no future extensions will be related to this situation." (Shank R4, tab 22 at 341) The government applied that analysis to all of the projects affected by the border closure (Shank R4, tab 22 at 337-38). Indeed, the government concedes in this appeal that the border closure was beyond IAP's control, occurred without its fault, and constituted an excusable delay with respect to all three task orders (app. supp. R4, tab 41, gov't reply to app. first req. admissions at 2216, ¶¶ 1-2).

19. The government's explanation for permitting a 75-day extension began with its belief that within 2 weeks of the border closing, or by 10 December 2012, contractors should have developed alternate plans to ship generators into Afghanistan.

6

It concluded that 75 days generally reflected the amount of time that had elapsed from the task orders' original notices to proceed until 10 December. Thus, the government believed that by granting 75 days it had "reset" the notice to proceed to that date, which it considered fair. (App. supp. R4, tab 42, Basler dep., ex. 4 at 2390, tab 45, Eckhardt dep. at 2766-67; supp. R4, tab 34, Eckhardt aff. ¶¶ 8-10, tab 36, Gibison aff. ¶¶ 19-20) The government did not consider how long it would take to ship generators via the NDN or the circumstances applicable to each task order. Thus, IAP's obstacles transporting the Shank generators out of Karachi were not considered relevant. (Supp. R4, tab 34, Eckhardt aff. ¶ 11, tab 36, Gibison aff. ¶ 20; app. supp. R4, tab 42, Basler dep. at 2296-97, tab 43, Gibison dep. at 2473-74, 2507-08)

20. On 23 March 2012, the government issued a unilateral modification to Delivery Order 0008, extending the commission date for the plant at FOB Sharana by 75 days, to 18 May 2012, "to compensate for delay of equipment due to the closure of the Pakistan border" (Sharana R4, tab 19).

21. On 5 April 2012, the parties executed a bilateral modification of Delivery Order 0004, extending the commission date for the plant at FOB Shank 155 days to 27 June 2012. The extension was required because of the differing site conditions at the base unrelated to the border closure and provided a total of 275 days from notice to proceed. (Shank R4, tab 18) On 14 May 2012, the government unilaterally modified the delivery order, extending the commission date for the plant at FOB Shank by an additional 75 days, to 10 September 2012, "to compensate for delay of equipment due to the closure of the Pakistan border" (Shank R4, tabs 20-21).

22. There is no evidence that Delivery Order 0005 was extended for FOB Dwyer.

23. On 15 May 2012, Mr. Parker emailed the government that 75 days might not be a sufficient extension for Shank because the border remained closed (Shank R4, tab 23 at 347). Mr. Gibison responded on 17 May, asking whether "IAP [would] take action to ensure that a plant arrives at Shank in enough time to [meet] the new completion date" (Shank R4, tab 23 at 347). Mr. Hammerle's 18 May reply reminded Mr. Gibison that the Shank generators were "stuck in Karachi due to the current border closure." He explained that commissioning the plant depended on the border reopening and the length of time necessary to clear customs and transport the generators given the backlog. Mr. Hammerle noted again that another option would be to use a second set of generators "at significant additional costs" that he did not believe IAP should have to bear. IAP would proceed with this second option if the government agreed to incur the associated costs, or if the contracting officer ordered IAP to comply with the revised completion date despite the excusable delay caused by the border closure. (Shank R4, tab 23 at 346) On 13 June, IAP requested another extension of time to commission Shank beyond the 75 days that had been granted

7

(app. supp. R4, tab 41, gov't reply to app. first req. admission at 2217, ¶ 3). On 15 June, Ms. Schoenherr sent Mr. Parker a letter repeating the government's conclusion that the border closure was an excusable delay. However, the government would not reimburse IAP for any costs associated with that delay, and IAP would only receive the 75-day extension already granted for Shank. Ms. Schoenherr warned that "if IAP [did] not meet the contractual delivery commission date of 10 September 2012 [it would] be in default of [its] contract." (Shank R4, tab 23 at 350) By letter to Ms. Schoenherr dated 20 June, IAP replied that it was shipping a second set of generators under protest in response "to the Government's direction to meet the 10 September commissioning date or risk termination for default" (Shank R4, tab 24 at 353).

24. In mid-June 2012, Mr. Hammerle gave Aggreko instructions to proceed with shipping a second set of Shank generators via the NDN (app. supp. R4, tab 47, Hammerle aff. ¶¶ 30-31,).

25. On 3 July 2012, Pakistan reopened its border with Afghanistan (Sharana R4, tab 8 at 241, Parker aff. ¶ 11).

26. By 21 September 2012, 18 of the 23 generators in the second Shank set were on site at the base and capable of supplying power. All of the remaining containers were expected to arrive by the 24th. The contracting officer recognized that there had been delays admitting the containers onto the base because of its scanner and allowed some delay for commissioning. (Shank R4, tab 27 at 366) On 8 October 2012, the government certified the commissioning of the plant at FOB Shank (Shank R4, tab 28). Had IAP shipped the original set of generators into Afghanistan upon the reopening of the border they would likely have arrived at the base in mid-October 2012 and could have been available for commissioning in November or December (app. supp. R4, tab 49, Bannister decl. ¶¶ 29-30). IAP incurred extra costs shipping the second set of generators into Afghanistan to comply with the government's performance deadlines (app. prop. finding 53; gov't prop. finding 69).

27. IAP knew that transporting heavy equipment across the Pakistan-Afghanistan border posed risks of closures (app. supp. R4, tab 47, Hammerle aff. at 3176, ¶ 15, tab 48, Kelly decl. at 3188, ¶ 27). However, prior closures of that border had lasted no more than two weeks (app. supp. R4, tab 41, gov't reply to app. first req. admissions at 2221, ¶ 19). Neither party anticipated the border closing seven months (app. supp. R4, tab 43, Gibison dep. at 2441, tab 47, Hammerle aff. at 3176, ¶ 15, tab 48, Kelly decl. at 3188, ¶ 28). It was not reasonable for IAP to foresee a closure lasting that length of time (app. supp. R4, tab 43, Gibison dep. at 2241, tab 45, Eckhardt dep. at 2766).

28. On 16 October 2013, IAP submitted certified claims for each delivery order arising from the border closure. Specifically, it sought $9,338,752.71 for Delivery

8

Order 0004 (Shank), $1,004,781.51 for Delivery Order 0005 (Dwyer), and $1,401,352.26 for Delivery Order 0008 (Sharana). (Shank R4, tab B; Dwyer R4 tab B; Sharana R4, tab B) The claims were denied by final decisions issued on 23 May 2014 (Shank R4, tab A; Dwyer R4, tab A; Sharana R4, tab A). The final decisions were timely appealed to the Board and were docketed as ASBCA No. 59397 (Shank), No. 59398 (Dwyer), No. 59399 (Sharana).

## DECISION

### I. Constructive Acceleration

IAP advances several arguments to support an equitable adjustment entitling it to costs arising from the border closure. First, IAP claims the government constructively accelerated IAP's performance of all three task orders by failing to timely grant it requests for extension after Pakistan closed the border with Afghanistan. Later, the government failed to grant sufficiently lengthy extensions. "Constructive acceleration often occurs when the government demands compliance with an original contract deadline, despite excusable delay by the contractor." *Zafer Taahhut,* 833 F.3d at 1362. Recovery arises under the contract's changes clause. *Fraser Constr. Co. v. United States,* 384 F.3d 1354, 1360 (Fed. Cir. 2004); *Norair Eng'g Corp. v. United States,* 666 F.2d 546, 548 (Ct. Cl. 1981). The contractor "is entitled to reimbursement for expense actually and reasonably incurred in complying with an acceleration order." *Sun Shipbuilding & Drydock Co.,* ASBCA No. 11300, 68-1 BCA ¶ 7054 at 32,609. To establish entitlement to compensation arising from an acceleration, the contractor must prove:

> (1) [T]hat the contractor encountered a delay that is excusable under the contract; (2) that the contractor made a timely and sufficient request for an extension of the contract schedule; (3) that the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) that the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) that the contractor was required to expend extra

9

resources to compensate for the lost time and remain on schedule.

*Zafer Taahhut,* 833 F.3d at 1362 (quoting *Fraser Constr.,* 384 F.3d at 1361).

## A. Excusable Delay

The first and central element of an acceleration claim is proof of an excusable delay. *Lovering-Johnson, Inc.,* ASBCA No. 53902, 06-1 BCA ¶ 33,126 at 164,174. Pursuant to the Default clause for fixed-price supply and service contracts contained in FAR 52.249-8(c), a delay is excusable "if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Contractor." *See* JOHN CIBINIC, JR., ET AL., ADMINISTRATION OF GOVERNMENT CONTRACTS, 538 (4th ed. 2006); *see also Sauer Inc. v. Danzig,* 224 F.3d 1340, 1345 (Fed. Cir. 2000) (holding that the excusable delay of a fixed-price construction contract is governed by the Default clause applicable to those contracts). Here, IAP planned to ship all of the generators by the Pakistan route, which it had used 14 previous times, and which the government admits was less expensive and required less time than the NDN (findings 6-7, 10). Indeed, IAP shipped the Shank generators as far as Karachi when Pakistan closed the border with Afghanistan (findings 9-10). Though IAP knew that the Pakistan route posed risks, prior closings of the border between Afghanistan and Pakistan had lasted no more than two weeks. It was not reasonable for IAP to foresee a closure lasting seven months. (Finding 27) The government concedes that Pakistan's closure of the border was beyond IAP's control, did not result from IAP's fault, and constituted an excusable delay with respect to all three task orders (finding 18). There is no evidence supporting a contrary conclusion. Accordingly, IAP has established an excusable delay of at least 218 days, from 28 November 2011, when the border closed, until at least 3 July 2012, when it reopened, and should have been granted an extension of the delivery periods. *See Alley-Cassetty Coal Co.,* ASBCA No. 33315, 89-3 BCA ¶ 21,964 at 110,490 (recognizing an excusable delay entitles a contractor to an extension of the delivery period).

## B. Requests for Extension, Denial, and Order to Accelerate

By 6 December 2011, IAP had notified Ms. Price, the government's contracting officer, that the border closure was delaying the transportation of IAP's power plant equipment into Afghanistan and that IAP expected a schedule adjustment (findings 10-11). However, the government's written response merely reiterated that the contract was fixed price, followed by a telephone conversation in which Ms. Price clarified that IAP would not be granted extensions of any of the task orders. She stated that failure to meet the established deadlines would constitute default. (Finding 13) Thus, IAP timely requested an extension that was denied by the government, accompanied by its insistence that IAP complete performance on time.

10

Ms. Price repeated her position that that there was no excusable delay arising from the border closure on 20 January 2012, stressing that IAP should not wait for the border to reopen and that it should do everything in its power to deliver on time or be in default (finding 16). Refusal of a proper request for an extension arising from an excusable delay, coupled with a threat of default, constitutes an acceleration. *See Fraser Constr.*, 384 F.3d at 1367 (citing *Norair Eng'g Corp.*, 666 F.2d at 548); *Mech. Utils., Inc.*, ASBCA Nos. 7345, 7466, 1962 BCA ¶ 3556; *see also Alley-Cassetty Coal*, 89-3 BCA ¶ 21,964 at 110,490-91.

The government maintains that IAP did not request a time extension for the Dwyer and Sharana task orders. That contention is incorrect. IAP's 6 December 2011 letter to Ms. Price referred to all three task orders in the subject line. It stated IAP was experiencing delays because of the border closure and that it expected a schedule adjustment. (Finding 11) Furthermore, Ms. Price told IAP in the December telephone call that the government would not grant extensions for any of the task orders, demonstrating she knew extension requests had been made for all three (finding 13). Subsequent IAP letters to Ms. Price repeated the position that the border closure caused a changed condition or excusable delay beyond IAP's control for all of the task orders (finding 15).

The government's acceleration was not diminished by its February 2012 change of mind, when it decided that the border closure was an excusable delay and extended the Shank and Sharana task orders by 75 days (findings 18-21). First, Dwyer was not extended. Second, by the time Sharana was extended in March, IAP had been engaged for three months in the extraordinary measure of shipping those generators on the more expensive NDN route after the government denied earlier extension requests. Also, the government only extended Sharana to 18 May, well before the border reopened on 3 July. (Findings 14, 20) The government's failure to grant an extension within a reasonable time after notice of the excusable delay experienced, along with its failure to provide an extension for the entire excusable delay experienced, dictates its liability for acceleration costs. *See McKenzie Eng'g Co.*, ASBCA No. 53374, 02-2 BCA ¶ 31,972 at 157,925; *see also Robust Constr., L.L.C.*, ASBCA No. 54056, 05-2 BCA ¶ 33,019 at 163,649 (holding that an extension failing to account for all of the excusable delay experienced is an acceleration).

Similarly, the Shank generators were in Karachi and bound for the border when it closed (findings 9-10). After first denying IAP extension requests to account for the excusable delay, the government's grant of 75 days in May 2012, until 10 September, was not connected to the delay or any expectation about when the border would reopen. It was based merely upon an estimate of the amount of time that transpired from the date the government issued the original notice to proceed until 10 December 2011, two weeks after the border closed. The government believed that by granting 75 days it had "reset" the notice to proceed to 10 December and that it was then fair to

11

expect IAP to implement an alternate plan to deliver the generators within the time originally contemplated by the task order. However, the government did not consider relevant how long it might take to deliver generators using an alternate route, or the difficulties transporting them out of Karachi. (Finding 19) IAP explained to the contracting officer that 75 days may not be adequate because the border remained closed and sought additional time, but was told to comply or be in default (finding 23). In response to that direction, IAP engaged in the extraordinary measure of leasing a second set of generators to ship via the NDN (findings 23-24).

The government cites *Jennie-O Foods, Inc. v. United States,* 580 F.2d 400 (Ct. Cl. 1978); *Phillips National, Inc.,* ASBCA No. 53241, 04-1 BCA ¶ 32,567; and *Morganti National, Inc. v. United States,* 49 Fed. Cl. 110, 132 (2001), for the proposition that IAP was not entitled to an extension of time for the excusable delay caused by the border closure as long as it was "physically and legally possible to perform" the task orders, including shipping via the lengthier and more expensive NDN with a second set of generators for Shank. Those decisions merely address the standards for determining when an excusable delay is present. The government has already admitted the border closure was an excusable delay. None of them hold that contractors guarantee timely delivery, even when confronted with excusable delays, so long as performance can be achieved at some price.

Indeed, RESTATEMENT (SECOND) OF CONTRACTS § 269, generally suspends a duty to perform that has become temporarily impracticable while that impediment exists. Additionally, in *Alley-Cassetty Coal,* the Board recognized that excusable delays caused by river ice entitled coal shippers to an extension of time notwithstanding the existence of more expensive shipping methods. 89-3 BCA ¶ 21,964 at 110,490. The most apt precedent might be *Dougherty Overseas, Inc.,* ENGBCA No. 2625, 68-2 BCA ¶ 7165. There, the government executed a 1961 contract for highway construction in Afghanistan that contemplated shipping bulky equipment into Karachi and then by rail over the Pakistan-Afghanistan border. During performance, Afghanistan closed the border. The government ordered continued performance by whatever means necessary, and the contractor complied using alternate sources. The Board held the border closure excused performance during its duration and that the government's order to perform anyway was an acceleration. Though the government had recognized some extension of time, the Board held that the contractor should have been granted "the greater period of time it would take for completing the work in view of the border closure without resorting to extraordinary measures to continue performance despite the border closure." *Dougherty Overseas,* 68-2 BCA ¶ 7165 at 33,247. The same reasoning applies here. Instead of permitting IAP the time necessary to deliver the generators after the border reopened and the excusable delay came to an end, the government arbitrarily limited the extension it allowed to 75 days, coupled with threats of default in the absence of delivery by then. Confronted with that threat, IAP had to resort to the extraordinary measure of leasing a

second set of generators for Shank and shipping all three sets over the NDN. Denying IAP the period of time needed to complete the deliveries after the border reopened was an acceleration of all three task orders.

## C. Extra Resources Expended

The final element to establish entitlement to reimbursement because of an acceleration is whether the contractor incurred extra costs accelerating its performance. After Ms. Price verbally denied IAP's extension requests in December and ordered compliance with established deadlines, IAP recognized it could not wait an indefinite amount of time for the border to reopen and hope time would remain to meet the performance deadline. Thus, it abandoned the Pakistan route in late December for the Dwyer and Sharana generators and incurred the extra expense of shipping them via the NDN (finding 14). Similarly, after multiple refusals of extensions to permit the trapped Shank generators to continue into Afghanistan when the border reopened, culminating with the government's declaration that failure to meet its arbitrary 75-day extension would constitute default, IAP incurred the expense of shipping a second set of generators for Shank through the NDN (finding 26). This insistence upon performance under a schedule that failed to account fully for the excusable delays, accompanied by threats of default, entitles IAP to an equitable adjustment reimbursing it for expenses actually and reasonably incurred in complying with the acceleration orders.

## II.    Constructive Change

In addition to claiming acceleration, IAP contends the government is responsible for a constructive change to the contract by ordering IAP to ship the generators using alternate routes. A constructive change is work stemming from an informal change order or arising from the government's fault. *Zafer Taahhut*, 833 F.3d at 1361; *ECC, Int'l*, 13 BCA ¶ 35,207 at 172,737. The government did not expressly order shipment via the NDN. However, as already noted, the government did accelerate performance and in that way became liable for a constructive change.

## III.    Constructive Suspension of Work

IAP also claims the government is liable for a constructive suspension of work, and presumably increased costs of performance, due to the border closure. It relies upon *Merritt-Chapman & Scott Corp. v. United States*, 429 F.2d 431, 432 (Ct. Cl. 1970). In that case, the United States Court of Claims found a constructive suspension arising from an unreasonably long delay that was not the government's fault but was for the government's convenience. *See also Nydan Constr. Co.*, ASBCA No. 31194, 87-3 BCA ¶ 20,187 at 102,167. Here, there is no evidence the border was closed for the convenience of the government. It was closed by Pakistan after a combat operation by

13

the United States and NATO. *Zafer Taahhut,* 833 F.3d at 1359, 1364. It was not a constructive suspension of work by the government.

## IV.    Commercial Impracticability

IAP also contends that the government's unilaterally imposed commissioning deadlines were commercially impracticable because of the border closure. "A contract is commercially impracticable when performance would cause 'extreme and unreasonable difficulty, expense, injury, or loss to one of the parties." *Raytheon Co. v. White,* 305 F.3d 1354, 1367 (Fed. Cir. 2002) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d (1981)). Commercial impracticability normally excuses performance unless a party has assumed the risk of the occurrence. *Id.* However, in government contracting, impracticability may constitute a constructive change that entitles a contractor to an equitable adjustment. *Id.* As observed, the government's failure to recognize the excusable delays caused by the border closure, and resulting acceleration of IAP, entitles IAP to an equitable adjustment for the costs complying with those acceleration orders. IAP has not shown that, absent those acceleration costs, performance would have otherwise been impracticable. Thus, it is not entitled to any additional recovery.

## V.    Warranty of Availability

IAP's final argument is that the closure of the border constitutes a breach by the government of a warranty of availability of the shipping route through Pakistan. IAP says that the government's approval of IAP's own representations in its Shank and Dwyer proposals that the generators would "ship...45-90 days prior to mobilization depending upon the conditions at the border" established a government warranty that the border between Pakistan and Afghanistan would remain open (finding 4). IAP also suggests that interference with its performance by a third party constitutes a government breach of warranty. Additionally, IAP maintains that because its prior course of conduct shipping supplies into Afghanistan was through Pakistan, the parties' course of dealing established a government warranty of the route's availability.

"[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself." *Oman-Fischbach Int'l (JV) v. Pirie,* 276 F.3d 1380, 1383-84 (2002) (quoting *Dale Constr. Co. v. United States,* 168 Ct. Cl. 692, 699 (1964)). To recover for breach of warranty, IAP must demonstrate:

> [T]hat the [government] provided a warranty either
> explicitly or implicitly in its contract by showing that:

"(1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue."

*Id.* at 1384 (quoting *Kolar, Inc. v. United States,* 650 F.2d 256, 258 (Ct. Cl. 1981)); *see also Contrack Int'l, Inc.,* ASBCA No. 59917, 16-1 BCA ¶ 36,532 at 177,952.

There is no merit to IAP's suggestion that its own statements about its intended shipping method constitute a government assurance of border access. The government did not represent that it controlled the border or that it assumed the risk of a border closure. If anything, the opposite is the case. The contract incorporated FAR 52.247-34, F.O.B. DESTINATION (NOV 1991) (finding 1). That clause states that "[t]he Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery...of the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity." FAR 52.247-34(a)(2). The government did not close the border. Pakistan did. *Zafer Taahhut,* 833 F.3d at 1363. IAP's assertion that Pakistan's interference with its access to the border amounts to a breach of warranty by the government is also incorrect. "[A]bsent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties." *Oman-Fischbach,* 276 F.3d at 1385 (quoting *Dale Constr.,* 168 Ct. Cl. at 698). Unless the government assumed the risk of Pakistan's acts in unmistakable terms, it is not liable for them. *Id.* FAR 16.202-1 explains that a firm-fixed-price contract such as this one "places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss." Nothing in the contract shifted the risk of increased costs caused by third parties from IAP to the government.

Finally, the Second Restatement of Contracts provides the Board's standard for recognizing a course of dealing. *Tech. Sys., Inc.,* ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387. In summary, it is "a sequence of previous conduct between the parties...which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RESTATEMENT (SECOND) OF CONTRACTS § 223(1) (1981). The course of dealing must be reasonably construed to indicate the parties' intentions or provide "a reflection of their joint or common understanding." *Tech. Sys.,* 17-1 BCA ¶ 36,631 at 178,387 (quoting *Sperry Flight Sys. v. United States,* 548 F.2d 915, 923 (Ct. Cl. 1977)). IAP relies upon its past practice of shipping materials into Afghanistan over the Pakistan route and contends that the government knew "that course of dealing formed the basis for IAP's proposed plan for performance." IAP has not shown the parties previously engaged in conduct establishing a guarantee of border access by the government. It has not presented any evidence of conduct indicating a belief by either party that the government controlled

15

the border or assumed the risk of a border closure. The mere fact that IAP had previously shipped supplies through Pakistan does not reflect a "joint or common understanding" of a government assurance that the border would remain open. Accordingly, IAP's contention that the government warranted its access to the border and breached that commitment when Pakistan closed the border is rejected.

CONCLUSION

IAP encountered an excusable delay performing the three task orders as a result of Pakistan closing its border with Afghanistan. The government accelerated performance when it failed to timely grant extensions to fully account for the delay. IAP is entitled to an equitable adjustment reimbursing it for expenses actually and reasonably incurred in complying with the acceleration orders. The remainder of IAP's arguments are rejected. The appeal is returned to the parties for resolution of quantum issues consistent with this decision.

Dated: 17 May 2017

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59397, 59398, 59399, Appeals of IAP Worldwide Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
